43966. UNITED STATES FIRE INSURANCE COMPANY, INC.
v. CAPITAL FORD TRUCK SALES, INC.
(355 SE2d 428)

MARSHALL, Chief Justice.

We granted certiorari in the present case, *Capital Ford Truck Sales v. U. S. Fire Ins. Co.*, 180 Ga. App. 413 (349 SE2d 201) (1986), in order to decide whether an "excess" or "umbrella" liability insurance carrier is required to provide first-dollar coverage to the insured, and to defend an action against the insured, if the "primary" or "underlying" insurer has become insolvent. The excess-insurance policy in this case has been represented to us as a standard-form policy used throughout the insurance industry. For reasons which follow, we hold that under this policy, even though the primary insurer has become insolvent, the excess insurer is not required to defend the action against the insured or to provide first-dollar coverage. We, therefore, reverse the decision of the Court of Appeals, which reversed the trial court's grant of summary judgment to the excess insurer.

In this case, an employee of Capital Ford Truck Sales, Inc. (Capital) was involved in a collision with an automobile while driving a truck owned by Capital in the course of his employment. The passenger in the automobile filed a personal-injury action against Capital and against the driver of the automobile in which she was riding. She alleged that as a direct and proximate result of the collision, she received serious bodily injuries, a brain contusion, amnesia, a personality change, and epileptic seizures which will continue for the remainder of her life. She sought to hold the two named defendants jointly and severally liable "in such sum as may be determined by the jury."

At the time of the collision, Capital was covered by an automobile liability insurance policy with Aspen Indemnity Corporation (Aspen) in the amount of $1,000,000 per occurrence. Also in force was a "Commercial Comprehensive Catastrophe Liability Policy" issued by United States Fire Insurance Company (U. S. Fire), which provided excess liability insurance coverage up to $5,000,000 per occurrence. Aspen, the primary insurer, undertook to defend the action. However, Aspen subsequently became insolvent and withdrew from the case. Capital then made a demand upon U. S. Fire to provide a defense. U. S. Fire denied both primary coverage under its policy with Capital, as well as its obligation to defend the action.

Capital then filed a third-party complaint against U. S. Fire, alleging that in refusing to defend this action U. S. Fire had breached

its insurance contract with Capital and had acted tortiously and in bad faith. As a result, Capital sought to hold U. S. Fire liable for any judgment rendered against Capital up to the policy limits of the excess insurance policy. Capital also sought the recovery of attorney fees, the costs of the defense, and punitive damages.

U. S. Fire filed a motion for summary judgment on the third-party complaint, arguing that it was under no contractual obligation to defend the underlying action and that its coverage of Capital did not become applicable until damages exceeded the $1,000,000 limit of the underlying policy with Aspen. The trial court granted U. S. Fire's motion for summary judgment.

On appeal, the Court of Appeals reversed. After examining the applicable provisions of Capital's insurance policy with U. S. Fire, the Court of Appeals held that there exists an ambiguity on the question of whether U. S. Fire is obligated to defend Capital in the underlying personal-injury action. Therefore, the Court of Appeals reversed the order of the trial court granting U. S. Fire's motion for summary judgment. However, the Court of Appeals did not resolve the question of whether U. S. Fire is required to provide first-dollar coverage to Capital or whether the threshold point at which its coverage of Capital begins is $1,000,000.

1. In *Garmany v. Mission Ins. Co.*, 785 F2d 941, 945 (11th Cir. 1986), the Eleventh Circuit Court of Appeals, canvassing "general principles of insurance contract construction" under Georgia law, observed:

"[A]mbiguities in an insurance contract must be construed strongly against the carrier, and an insurance policy must be construed to provide coverage unless 'the contrary clearly appears.' *Travelers Indemnity Co. v. Whalley Constr. Co.*, 160 Ga. App. 438, 441, 287 SE2d 226 (1981). 'Any reasonable doubt as to uncertain language will be resolved against the insurer.' *Nationwide Mutual Fire Ins. Co. v. Collins*, 136 Ga. App. 671, 676, 222 SE2d 828 (1975). 'The test is not what the insurer intended its words to mean, but what a reasonable person in the position of the insured would understand them to mean.' Id. at 675, 222 SE2d 828. As a matter of public policy, it is generally recognized that insurance policies are to be 'liberally construed for the protections not only of the insured . . . , but also the innocent plaintiff who was injured.' *Float-Away Door Co. v. Continental Casualty Co.*, 372 F2d 701, 705 (5th Cir. 1966), *cert. denied*, 389 U. S. 823, 88 SC 58, 19 LE2d 76 (1967), *quoting Eggerding v. Bicknell*, 20 N.J. 106, 118 A2d 820 (1955).

". . . [H]owever, . . . under Georgia law in attempting to ascertain the intentions of the parties, insurance contracts are governed by the ordinary rules of construction applicable to other contracts. *Golden v. National Life & Accident Ins. Co.*, 189 Ga. 79, 87, 5 SE2d 198 (1939).

The contract must be examined 'as a whole' in attempting to construe any portion thereof. *Collins,* 136 Ga. App. at 675, 222 SE2d 828, *quoting Cotton States Mut. Ins. Co. v. Hutto,* 115 Ga. App. 164, 166, 154 SE2d 375 (1967). 'Where the terms and conditions of a policy are unambiguous, the court must declare the contract as made by the parties . . . . Where the meaning is plain and obvious, it should be treated as literally provided therein.' *Genone v. Citizens Ins. Co. of N. J.,* 207 Ga. 83, 86, 60 SE2d 125 (1950) (citations omitted)."

2. Insurance policies commonly referred to as "catastrophe liability policies" are designed to provide excess or supplemental protection. *Molina v. U. S. Fire Ins. Co.,* 574 F2d 1176, 1177 (4th Cir. 1978). As previously stated, these are also referred to as umbrella insurance policies. "[T]he umbrella policy has two functions: 1) to provide for a higher limit of liability for those losses typically covered by liability insurance - general liability and comprehensive auto liability for bodily injury and property damage; 2) to provide for some coverage of those less common losses not typically covered by liability insurance - e.g., malpractice liability, advertiser's liability, blanket contractual liability, world-wide operations liability, etc." *Garmany v. Mission Ins. Co.,* supra, 785 F2d at p. 948, citing from *Ridgeway v. Gulf Life Ins. Co.,* 578 F2d 1026, 1030 (5th Cir. 1978). See also 8 A. J. Appleman Ins. Law and Practice, § 4909.85 (Rev. ed. 1981).

(a) In *Molina v. U. S. Fire Ins. Co.,* supra, the Fourth Circuit held that the excess medical-malpractice insurer there was not obligated to provide the insured with a defense in the medical-malpractice action being brought against the insured, or to pay any sums recovered against him which were not in excess of the underlying insurance coverage, notwithstanding the fact that the underlying insurer had become insolvent. The reasons for this holding were provisions in the excess-insurance policy stating: that the excess insurer was only obligated to pay the "ultimate net loss" in excess of the policy limits of the underlying insurance; that "collectible" underlying insurance was required to be kept in force; and that the excess policy would be substituted as underlying insurance, in the event of a reduction or exhaustion of the limits of liability of the underlying policy *by reason of losses paid thereunder.*

(b) In *St. Vincent's Hosp. &c. Center v. Ins. Co. of North America,* 457 NYS2d 670 (117 Misc.2d 665) (1982), the New York court held that under the "plain and ordinary meaning" of an excess-insurance policy requiring the excess insurer to indemnify the insured for losses in excess of the amount specified in the primary insurance policy, the insolvency of the primary insurers did not create liability on the part of the excess insurer for lesser amounts. Citing *Molina v. U. S. Fire Ins. Co.,* supra, the court also held that insolvency of the primary insurers did not result in the primary insurance being "ex-

hausted" within the meaning of the excess policy.

(c) In *Prince Carpentry, Inc. v. Cosmopolitan Mut. Ins. Co.*, 479 NYS2d 284 (124 Misc.2d 919) (1984), the New York court rejected the argument that, as a result of the primary insurer's insolvency, the excess insurer would then be substituted for the underlying carrier, with its liability starting with the first dollar of any judgment rendered against the insured. The court held that the excess policy was triggered by "exhaustion" of the underlying policy only *by reason of losses paid thereunder*, and "[c]atastrophe policy though it may be, the excess insurer is not insuring against the insolvency of the primary insurer . . ." 479 NYS2d, supra at pp. 292-293.

(d) In *Garmany v. Mission Ins. Co.*, supra, the excess insurance policy set the upper limit of the underlying insurance policy, which was $500,000, as the starting point for coverage of each occurrence covered by the underlying insurance, or $10,000 in respect of each occurrence not so covered. Specifically, the excess policy provided that the excess insurer, Mission Ins. Co. (Mission), would only be liable for the "ultimate net loss the excess of either (a) the limits of the underlying insurances as set out in the attached schedule in respect of each occurrence covered by said underlying insurances or (b) the amount as set out in . . . the Declarations ultimate net loss in respect of each occurrence not covered by said underlying insurances . . ." 785 F2d, supra at p. 943, n. 1. The insured, Hutchinson Motor Co. (Hutchco), was an automobile dealer who was sued when an uninsured motorist, James Hamilton, was involved in a collision while driving one of its cars. The underlying insurance policy provided no coverage for permissive users such as Hamilton unless they had no available insurance coverage, in which event the underlying policy provided coverage only to the extent required by law, which at that time was $10,000 per person and $20,000 per accident. Judgments were rendered against Hamilton in three separate trials totaling $542,809.50.

The Eleventh Circuit Court of Appeals held that the excess-insurance coverage provided to Hamilton commenced at the $500,000 level stated in the schedule describing the underlying insurance policy and not at $20,000, which was the amount of coverage actually provided in the case. The Court of Appeals held that although the excess policy "could have been clearer in setting forth the threshold point for the onset of excess coverage . . . that fact does not mandate the conclusion that the policy was legally ambiguous." 785 F2d at p. 945.

The Court in *Garmany*, quoting from *Fried v. North River Ins. Co.*, 710 F2d 1022 (4th Cir. 1983), stated, "[Excess-insurance] policies are intended to provide low cost coverage for catastrophic losses beyond the bounds of ordinary primary limits, and the insurer must be able to ascertain the point at which its liability will attach in order to gauge the insurable risk and its cost of coverage. 'To hold otherwise

subjects the insurer to unforeseeable and variable risks depending upon the underlying insurance actually maintained by any one of the potential insureds.' 710 F2d at 1026-27 & n. 6." *Garmany*, supra, 785 F2d at p. 947.

(e) In *Mission Nat. Ins. Co. v. Duke Transp. Co.*, 792 F2d 550 (5th Cir. 1986), the Fifth Circuit held that under Louisiana law the excess insurer was not obligated to provide primary coverage or to defend the insured as a result of the primary insurance carrier's becoming insolvent. The excess policy there established the excess insurer's liability as the "ultimate net loss" in excess of either the limits of the underlying insurance policy as set out in the attached schedule ($300,000) in respect of each covered occurrence, or the amount set out in the declarations ($10,000) in respect of each occurrence not covered by underlying insurance. The excess policy also provided that it would continue in force as underlying insurance in the event of exhaustion of the limits of liability under the underlying insurance policy *by reasons of losses paid thereunder.*

In support of its holding, the court cited *Continental Marble & Granite v. Canal Ins. Co.*, 785 F2d 1258 (5th Cir. 1986). In *Continental Marble*, the excess-insurance policy, which was issued by Canal Insurance Company, stated, in effect, that the excess policy would provide primary coverage if the underlying policy was "inapplicable to the occurrence." The court in *Continental Marble* held that the primary insurer's insolvency did not render the primary insurance "inapplicable" to an occurrence covered by the terms of the primary policy. The court stated: "Imposing the duty of indemnification on Canal would, in effect, transmogrify the policy into one of guaranteeing the solvency of whatever primary insurer the insured might choose. *See Golden Isles Hospitals, Inc. v. Continental Casualty Co.*, 327 S2d 789, 790 (Fla. App. 1976). An excess liability insurer obviously does not anticipate this heavy onus: Excess or secondary coverage is coverage whereby, under the terms of the policy, liability attaches only after a predetermined amount of primary coverage has been exhausted. A second insurer thus greatly reduces his risk of loss. This reduced risk is reflected in the cost of the policy. [Cit.]" 785 F2d at p. 1259.

The court in *Mission Nat. Ins. Co. v. Duke Transp. Co.*, supra, also stated, "When an excess insurer uses the term 'collectible' or 'recoverable' it is agreeing to drop down in the event the primary coverage becomes uncollectible or unrecoverable; on the other hand, when an excess insurer uses the term 'covered' or 'not covered,' it is agreeing to drop down only in the event that the terms of the underlying policy do not provide coverage for the occurrence or occurrences in question." 792 F2d at p. 553.

(f) In *Radar v. Duke Transp., Inc.*, 492 S2d 532 (La. App. 1986),

the Louisiana appellate court held that the insolvency of the primary insurer, Northwestern Insurance Co., did not require the excess-liability insurer to provide primary insurance coverage and defend the action filed against the insured, Duke Transportation Inc. The "defense" provision of the excess policy required the excess insurer to defend the insured "[a]s respects occurrences covered under this policy, but not covered under the underlying insurances as set out in the attached schedule or under any other collectible insurance . . ."

The trial court had found this provision to be ambiguous, but the appellate court reversed. The appellate court held: "The defense provision in Mission's policy sets forth two alternative situations which would trigger Mission's duty to provide a defense for Duke. Assuming coverage under Mission's policy for the occurrence in question, Mission owes Duke a defense if Northwest's underlying insurance policy does not provide coverage for the specific occurrence *or* if the occurrence is not covered by any *other* collectible insurance. The word 'or' separating the two conditions is a disjunctive conjunction setting apart the two mutually exclusive alternatives . . .

"It is important to note that Mission's policy mandates that the other insurance be 'valid and collectible,' whereas there is no such requirement placed upon the scheduled underlying insurances, i.e., Northwest's policy of insurance. Thus, while the Mission policy specifically requires the 'other insurance' to be valid and collectible, no such restriction is placed on the underlying Northwest policy of primary insurance. The policy expressly mandates that the *other* insurance be valid and collectible. We cannot disregard the clear import of this language utilized in the Mission policy. Clearly, the plain and ordinary meaning of the policy dictates that Mission's duty to defend does not arise in the instant case where the accident at issue is covered by the underlying insurance policy provided by Northwest, irrespective of Northwest's insolvency. Mission's policy does not insure Northwest's solvency, but rather simply provides for insurance in an excess of the amounts specified in Northwest's primary insurance policy." 492 S2d at pp. 535-536.

3. The relevant provisions of the excess-insurance policy in this case are stated in full in the Court of Appeals' opinion and will be summarized here:

(a) With respect to personal-injury liability, the "coverage" and "liability" provisions of Capital's excess-insurance policy with U. S. Fire require U. S. Fire to pay on behalf of Capital "the ultimate net loss in excess of the insured's retained limit defined as the greater of: (a) the total of the applicable limits [$1,000,000] of the underlying policies [the Aspen policy] listed in Schedule A hereof, and the applicable limits of any other insurance collectible by the insured; or (b) an amount as stated in Item 4 (C) of the declarations [0] as the result

of any one occurrence not covered by the said policies or [sic] insurance; and then up to an amount not exceeding the amount as stated in Item 4 (A) [$5,000,000] of the declarations as the result of any one occurrence . . .''

The above provisions clearly distinguish between the underlying insurance policy and other insurance, with the word "collectible" modifying only "other insurance" and not "the underlying policies."

(b) The "liability" provision further states, "In the event of the reduction or exhaustion of the aggregate limits of liability of the underlying policies listed in Schedule A *by reason of losses paid thereunder*, this policy, subject to the above limitations, (1) in the event of reduction, shall pay the excess of the reduced underlying limits; or (2) in the event of exhaustion, shall continue in force as underlying insurance." (Emphasis supplied.)

This provision expressly states that exhaustion of the aggregate limits of liability of the underlying policy must be by reason of losses paid thereunder.

(c) The "defense" provision states, "With respect to any occurrence not covered, as warranted, by the underlying policies listed in Schedule A hereof [the sole policy listed is that with Aspen] or not covered by any other underlying insurance collectible by the insured, but covered by the terms and conditions of this policy except for the amount of retained limit specified in Item 4 (c) of the declarations [0], the company shall," among other things, "defend any suit against the insured alleging such injury or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent . . .''

Again, this provision requires other underlying insurance to be "collectible," but does not so specify with respect to the underlying policy.

(d) There is a provision of the excess policy concerning "bankruptcy or insolvency," and this provides that the bankruptcy or insolvency of the insured shall not relieve U. S. Fire of any of its obligations under the policy.

It is true that U. S. Fire could have been more explicit by expressly providing for the bankruptcy or insolvency of the underlying insurer.

(e) The "other insurance" provision states that if other "collectible" insurance is available to the insured, the U. S. Fire policy will be in excess of, and not contribute with, such other insurance.

Thus, this provision too requires the "other insurance" to be "collectible."

(f) A provision concerning "underlying insurance" states that if "underlying insurance is exhausted by any occurrence," the company shall be obligated to assume charge of the defense, "but only where

this policy applies immediately in excess of such underlying insurance, without the intervention of excess insurance of another carrier."

This provision does not expressly state that the exhaustion of underlying insurance must be as a result of losses paid thereunder.

(g) A provision of the policy concerning "maintenance of underlying insurance" requires Capital to maintain in force the underlying insurance with Aspen "except for any reduction of the aggregate limits contained therein solely by payment of claims in respect of occurrences happening during this policy period."

4. We hold that — since this excess-insurance policy repeatedly distinguishes between the underlying insurance policy and other insurance, and since it repeatedly states that other insurance must be collectible, but does not so state with respect to the underlying insurance — the insolvency of the underlying insurer does not require the excess insurer to defend the insured in an action resulting from an occurrence covered by the underlying insurance policy, or to provide first-dollar coverage with respect to such occurrence. Neither obligation is triggered until judgments are rendered against the insured exceeding the limits of the underlying insurance policy with Aspen and other collectible insurance.

*Judgment reversed. All the Justices concur.*

DECIDED MAY 6, 1987.

*Drew, Eckl & Farnham, W. Wray Eckl, Georgia L. Schley,* for appellant.
*Mozley, Finlayson & Anderson, J. Arthur Mozley, Eric T. Johnson,* for appellee.