[No. B045661. Second Dist., Div. Three. Jan. 31, 1991.]

SPAN, INC., et al., Plaintiffs, Cross-defendants and Respondents, v. ASSOCIATED INTERNATIONAL INSURANCE COMPANY, Defendant, Cross-complainant and Appellant; REYNALDO LEDESMA, Defendant, Cross-complainant and Appellant.

464

## COUNSEL

Harrington, Foxx, Dubrow & Canter, Mark W. Flory, Jennifer N. Pahre and Nancy J. Mindel for Defendant, Cross-complainant and Appellant, Associated International Insurance Company.

Jones, Mahoney & Brayton, Paul M. Mahoney and Richard A. Soll for Defendant, Cross-complainant and Appellant, Reynaldo Ledesma.

No appearance for Plaintiffs, Cross-defendants and Respondents.

## OPINION

KLEIN, P. J.—Defendant, cross-complainant and appellant Associated International Insurance Company (Associated) appeals the judgment entered after the trial court granted summary judgment in favor of Reynaldo Ledesma (Ledesma), Span, Inc. (Span) and Behavioral Systems Southwest, Inc. (BSSI) in this declaratory relief action. Defendant, cross-complainant and appellant Ledesma has cross-appealed that portion of the summary judgment in favor of Associated.[1]

### SUMMARY STATEMENT

Associated issued an excess insurance policy to Span which provided coverage in the event of reduction or exhaustion of an underlying policy

---

[1] Neither Span nor BSSI appealed the trial court's ruling and neither party has filed briefs in this appeal. However, because Ledesma's notice of appeal indicates his counsel also represents Span and BSSI, Ledesma represents their interests here.

written by Union Indemnity of New York (Union), "by reason of losses paid thereunder." Union became insolvent.

While many foreign jurisdictions have found such language unambiguous, no California case has considered whether a policy containing this specific wording requires an excess carrier to "drop down" upon the insolvency of the primary carrier. ■ The rule in California requires that ambiguity in an insurance policy be interpreted in favor of the insured. (*Reserve Insurance Co.* v. *Pisciotta* (1982) 30 Cal.3d 800, 807-808 [180 Cal.Rptr. 628, 640 P.2d 764].) Applying the rule here, we find the Associated policy, unambiguously contemplates exhaustion of the underlying insurance only by payment. Therefore, Associated had no duty to provide first dollar coverage upon the insolvency of Union. We affirm the trial court's ruling in this instance. Therefore, Associated is liable only for that portion of the underlying judgment in excess of the Union policy limits.

We must further decide if the evidence presents a triable issue of fact as to whether Span breached the excess policy either by failing to notify Associated the underlying action was likely to involve Associated's layer of coverage or by entering into a collusive judgment.

We conclude Associated, as a matter of law, had sufficient knowledge of the underlying action as to amount to constructive notice its policy was likely to be involved. On this issue, summary adjudication in favor of Ledesma is appropriate. However, the existence of triable issues of material fact on the question of collusion precludes summary judgment. The matter therefore is remanded for further proceedings consistent with the views expressed herein.

## FACTUAL AND PROCEDURAL BACKGROUND

### a. *Background information.*

On July 26, 1982, Ledesma, a federal immigration officer, slipped and fell on premises leased and maintained as a detention center by Span and BSSI in Pasadena, California. Ledesma filed suit against Span, BSSI and others for personal injury (the *Ledesma* action).[2]

At the time of Ledesma's accident, Union insured Span against such liability up to $500,000. Associated provided Span with an umbrella policy

---

[2] In addition to Span and BSSI, formerly known as Rube Inc., Ledesma sued Martin H. Rub, Lori Rub, Robert A. Rub, Frances Rub, Harold Romain, and Pasadena Properties. Ledesma, at some point not relevant to this discussion, dismissed the action as to these defendants and they are not parties to this appeal.

of insurance in excess of Union's primary policy to an aggregate limit of $4.5 million.

Union defended Span in the *Ledesma* action until July 16, 1985. On or about that date, Union was placed in liquidation in the State of New York.[3]

In a letter dated October 18, 1985, Span's counsel, Timothy J. Hogan (Hogan), advised Associated of the pending *Ledesma* action. In response to Associated's request for further information, Hogan sent Associated a letter dated October 31, 1985, in which he stated Ledesma then claimed $19,000 in medical expenses and $28,000 in lost wages. That letter concluded: "This claim was not heretofore reported to your company as apparently it was believed that it was well within the coverage provided by the primary carrier. Once the primary carrier became insolvent, it thus became necessary to report it to you. We trust you will act promptly for the protection of your insured."

In a responsive letter dated November 13, 1985, Associated refused to assume the position of primary insurer and declined to provide a defense in the *Ledesma* action. Associated told Hogan: "The insolvency of Union Indemnity does not alter the Insuring Agreements and conditions of Associated International's excess umbrella liability policy . . . . [¶] Associated . . . stands ready to fulfill it's [*sic*] policy obligations . . . but will resist any effort to transform an excess insurance contract into a primary contract. Therefore, your demand that Associated . . . undertake the defense and indemnity of the insured is respectfully declined. [¶] . . . If [your] evaluation changes and the subject litigation ever represents and [*sic*] exposure excess of $500,000, we should be immediately advised. In the absence of such advise [*sic*], we will assume there is no such exposure."

On November 25, 1986, Span and BSSI filed the instant complaint for declaratory relief. They sought a declaration that Associated bore responsibility for any judgment obtained in the *Ledesma* action. Associated filed an answer which denied any responsibility to act as primary insurer. .

Before trial could be had, the *Ledesma* action went to court trial on June 29, 1988. However, that proceeding ended in a mistrial when the trial judge, the Honorable Melvin Grover, disqualified himself.

The *Ledesma* action thereafter was tried by the court on December 2, 1988. On January 3, 1989, the trial court entered judgment in favor of Ledesma in the amount of $1,276,000.

---

[3] The parties have advised this court the California Insurance Guarantee Association (CIGA) is not involved in this case because Union never qualified to do business in California.

Upon receipt of notice of the judgment in the *Ledesma* action, Associated filed a notice of appeal in that action but later abandoned it.

Associated then sought and received leave to file a cross-complaint in this declaratory relief action. The cross-complaint sought a declaration Associated was not required to "drop down" into Union's position as primary insurer. Associated further claimed it was not responsible for any part of the judgment in the *Ledesma* action because Span had violated the terms of the Associated policy based upon "the collusion and/or other improper conduct or procedures premising the underlying judgment . . . ."

Span and Ledesma answered the cross-complaint. Ledesma filed a cross-complaint against Associated seeking payment of the judgment.

b. *Ledesma's summary judgment motion in the declaratory relief action.*

On June 1, 1989, Ledesma filed a motion, joined in by Span and BSSI, for summary judgment against Associated in which he contended Associated bore responsibility for the entire $1,276,000 judgment. Attached to Ledesma's motion, among other papers, were declarations of William E. Harris (Harris), the attorney who represented Span in the *Ledesma* action after Union's insolvency, and Paul M. Mahoney (Mahoney), Ledesma's attorney. Also attached was a reporter's transcript of the court trial in the *Ledesma* action.

Harris, whom Span had retained at its own expense to defend the *Ledesma* action after Union's insolvency, declared he had advised counsel for Associated of the first trial date of the *Ledesma* action, June 6, 1988, and the continued date of June 29, 1988. Harris also asserted his predecessor, Hogan, had notified Associated of the *Ledesma* action by the exchange of letters in October 1985. Harris stated Associated had refused to accept the tender of the defense or to offer any assistance in the trial of the underlying lawsuit.

Mahoney declared counsel for Associated appeared at the mandatory settlement conference in the declaratory relief action and stated Associated would have nothing to worry about in the *Ledesma* action if the judgment did not exceed $500,000.

Mahoney further averred that on March 15, 1989, three months after entry of judgment in the *Ledesma* action, counsel for Associated told him: "[T]he attorney for Span and BSSI, Mr. Harris, had a duty to 'voluntarily keep them [Associated] apprised of the status of the case.'"

The reporter's transcript of the court trial in the *Ledesma* action attached to the motion indicates Harris waived opening and closing argument, stipulated to liability and to the reasonableness and necessity of Ledesma's medical bills and waived cross-examination of Ledesma, the only witness who testified.

The transcript further reflects that at the trial, based upon the evidence presented, Ledesma's counsel argued the 44-year-old Ledesma had been permanently disabled by the knee injury he suffered in the fall. Ledesma had undergone four surgeries and would, at some future date, require a total knee replacement. Counsel asked the trial court to award $460,000 in future lost wages, $1,095,000 in pain and suffering, and reimbursement of a future medical expenses for a total award of $1,643,000.

The transcript discloses that counsel for Span argued Ledesma's future lost earnings and general damages should not exceed $200,000 and $650,000, respectively. These amounts, combined with past medical expenses and loss of earnings of $75,000, plus suggested future medical expenses of $25,000, totalled $950,000. Counsel concluded: "It could be something much less than that if the court finds that the plaintiff could, through rehabilitation, education, go back to work and become a [*sic*] wage earner that he once was. [¶] I have nothing further."

c. *Associated's summary judgment motion in the same action.*

Associated opposed the motion and affirmatively sought summary judgment in its favor. It claimed its excess policy did not require it to "drop down," and it bore no responsibility for the judgment in the *Ledesma* action because of Span's failure to notify Associated of the possibility the judgment might invade its coverage as well as the assertedly collusive manner in which the judgment had been obtained.

In support of its motion, counsel for Associated averred: "During all the years of litigation, none of the parties had indicated to ASSOCIATED that exposure in this case would be significant, and in fact, the only numbers presented were the $19,000.00 in medical specials and $28,000.00 in lost wages provided by Mr. Timothy Hogan, former attorney for SPAN."

Associated's counsel attached to his declaration numerous documents from the superior court file in the *Ledesma* action. Among these were: a statement of damages filed by Ledesma on July 14, 1986, seeking $1 million in general damages and $1 million in special damages; an at-issue memorandum filed October 16, 1986, in which Ledesma indicated his general damages exceeded $1 million and medical specials then exceeded $30,000; an

arbitration status conference questionnaire which stated Ledesma had suffered "severe knee injuries," and indicated his total medical expenses to date exceeded $35,000 and involved a federal lien. The same document described Ledesma's future medical expenses, loss of earnings and future loss of earnings as "extensive." Another item was Ledesma's statement for a May 18, 1988, mandatory settlement conference which indicated the "demand to settle is $650,000."

In another declaration the senior vice-president of Associated acknowledged the exchange of letters between Hogan and Associated in October of 1985, but stated "the next piece of paper I received from any party regarding the underlying *Ledesma* case was a post-trial judgment indicating an award of $1,276,000.00 in Mr. LEDESMA'S favor."

Another attorney for Associated who attended a December 8, 1988, mandatory settlement conference in the declaratory relief action declared that after the Honorable Melvin Grover called the settlement matter in chambers, Mahoney asked Judge Grover to recuse himself because he had declared a mistrial in the *Ledesma* action.

When Judge Grover indicated he could not recall the mistrial, Mahoney produced a reporter's transcript of the proceedings. That transcript was attached as an exhibit to counsel's declaration.[4]

d. *The hearing on the motions for summary judgment.*

At the hearing, the trial court inquired whether Associated had the option to undertake the defense of Span in the *Ledesma* action.[5] When

---

[4] The transcript discloses that, after Ledesma's trial testimony, Judge Grover made the following assessment: "I think you better take this somewhere else. I'm going to recuse myself, but I can't believe what he's saying. I can't believe it and I don't believe it. And even though its a default, I can't in good conscience give you the kind of money that you are talking about."

"I will declare a mistrial and vacate the stipulation, and you can go somewhere else. But, really, I can't in good conscience do this."

Mahoney inquired, "You think the man's lying?"

Judge Grover answered, "Yes. I have bad knees. I have knees where there are no cartilage at all. I don't believe that he can't do anything. I just don't believe him. And even though its a default judgment, I can't in good conscience award the kind of money that you are talking about."

[5] Condition "H" of the Associated policy provides, in part: "[T]he company shall not be called upon to assume charge of the settlement or defense of any claim made or suit brought or proceeding instituted against the insured but the company shall have the *right* and shall be given the *opportunity* to associate with the insured or the insured's underlying insurers, or both, in the defense and control of any claim, suit or proceeding relative to any occurrence where the claim or suit involves, or appears reasonably likely to involve the company, in

advised Associated had that right but was not obligated to do so, the trial court stated: "And I must remark, also, that it's almost astonishing that what they said in effect to Mr. Hogan was carry on, because Mr. Hogan at that point quite obviously was an attorney who was not being paid. His carrier, Union Indemnity, was in bankruptcy. Span, . . . we can almost say with certainty had no money or he wouldn't have virtually stipulated to the judgment. [¶] But, nevertheless, Associated placed [its] fate in the hands of this attorney who had absolutely no legal obligation to them. I guess I'm just—I'm astonished that [it] would have done that."

The trial court stated its ruling in a minute order which read in part: "[T]o give judgment for Associated would result in the outrageous irony of leaving a permanently disabled plaintiff without recourse as a result of Associated's failure to defend a case of which [it was] demonstrably aware. Such would be to reward Associated for [its] own negligence at the expense of an innocent plaintiff. [¶] However, the Court finds that Associated is not contractually required to 'drop down' and provide the initial $500,000.00 coverage as a result of Union Indemnity's bankruptcy."

The trial court then directed summary judgment in favor of Span and Ledesma in the sum of the excess of $776,000 plus costs and interest. From this judgment, the instant appeal and cross-appeal followed.

## CONTENTIONS

Associated contends the trial court erred because the evidence shows Span violated the policy by failing to give appropriate notice and by collusively assisting Ledesma to obtain a judgment which invaded Associated's layer of coverage. Associated argues these circumstances relieve it of all responsibility to pay any portion of the *Ledesma* judgment. Alternatively, Associated claims triable questions of material fact exist as to these issues.

Ledesma contends the trial court erroneously concluded Associated had no duty to "drop down" to pay the entire judgment. Alternatively, Ledesma claims the trial court properly found Associated responsible for the excess portion of the judgment.

## DISCUSSION

1. *Standard of review.*

A "motion for summary judgment shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that

---

which event the insured and the company shall cooperate in all things in the defense of such claim, suit or proceeding." (Italics added.)

the moving party is entitled to a judgment as a matter of law . . . . [S]ummary judgment shall not be granted . . . based on inferences reasonably deducible from the evidence, if contradicted by other inferences or evidence, which raise a triable issue as to any material fact." (Code Civ. Proc., § 437c, subd. (c); *Mann v. Cracchiolo* (1985) 38 Cal.3d 18, 35-36 [210 Cal.Rptr. 762, 694 P.2d 1134].)

■ On appeal, this court conducts a de novo review of an order granting summary judgment. (*Price v. Wells Fargo Bank* (1989) 213 Cal.App.3d 465, 474 [261 Cal.Rptr. 735]; *AARTS Productions, Inc. v. Crocker National Bank* (1986). 179 Cal.App.3d 1061, 1064 [225 Cal.Rptr. 203].)

2. *The trial court properly concluded Associated had no duty to "drop down."*

a. *Existing California law provides general principles to be applied here.*

■ "In general, an excess insurance policy provides coverage that begins only after a predetermined amount of primary coverage is exhausted. This underlying coverage reduces the risk that an excess insurer will have to pay for losses incurred by the insured. This reduced risk to the insurer translates into a reduced premium to the insured." (*Steve D. Thompson Trucking v. Twin City Fire Ins.* (5th Cir. 1987) 832 F.2d 309, 310; *Signal Companies, Inc. v. Harbor Ins. Co.* (1980) 27 Cal.3d 359, 365 [165 Cal.Rptr. 799, 612 P.2d 889, 19 A.L.R.4th 75].)

The leading California case on the responsibility of an excess insurer to assume the position of an insolvent primary insurer is *Reserve Insurance Co. v. Pisciotta, supra*, 30 Cal.3d 800. The *Reserve* court held the issue must be resolved based upon the *wording* of the insurance contract.

*Reserve* stated: "We begin with established principles applicable to the interpretation of insurance policies. Words used in an insurance policy are to be interpreted according to the plain meaning which a layman would ordinarily attach to them. Courts will not adopt a strained or absurd interpretation in order to create an ambiguity where none exists. [Citations.] [¶] On the other hand, 'any ambiguity or uncertainty in an insurance policy is to be resolved against the insurer and . . . if semantically permissible, the contract will be given such construction as will fairly achieve its object of providing indemnity for the loss to which the insurance relates.' [Citations.] The purpose of this canon of construction is to protect the insured's reasonable expectation of coverage in a situation in which the insurer-draftsman

controls the language of the policy. [Citations.]" (*Reserve Insurance Co.* v. *Pisciotta, supra*, 30 Cal.3d at pp. 807-808.)

In *Reserve* the excess policy provided coverage for any excess over the " 'amount recoverable' " under the underlying policy. (*Reserve Insurance Co.* v. *Pisciotta, supra*, 30 Cal.3d at p. 812.) Our high court reasoned use of the phrase "amount recoverable" might be interpreted to expose the excess carrier to liability for amounts over the limit of the underlying policy, *or* for amounts which the insured is unable to recover from the underlying insurer because of its insolvency. "Because there are two meanings which may reasonably be attributed to the term . . . 'amount recoverable,' " the *Reserve* court construed the ambiguity in favor of the insured and concluded the excess insurer had to "drop down" upon the insolvency of the primary insurer. (*Id.* at p. 815.)

The *Reserve* court noted this result was not necessary in every instance of an insolvent primary insurer. It stated: "Insofar as *McConnell* [v. *Underwriters at Lloyds* (1961) 56 Cal.2d 637] implies that an excess insurer is always obligated to bear the risk of a primary insurer's insolvency, regardless of express exclusions of that risk, that decision appears unsupportable . . . . Rather, we follow the sound reasoning of *Fageol* [*T. & C. Co.* v. *Pacific Indemnity Co.* (1941) 18 Cal.2d 748] and ask whether the wording of the . . . policy requires [the excess insurer] to provide the coverage that [the primary insurer] would have assumed had it not become insolvent." (*Reserve Insurance Co.* v. *Pisciotta, supra*, 30 Cal.3d at p. 814.)

*Fageol T. & C. Co.* v. *Pacific Indemnity Co.* (1941) 18 Cal.2d 748, 751 [117 P.2d 669], involved an excess insurance policy which stated, " 'this insurance shall not apply nor contribute to the payment of any loss until all such specific insurance shall have been *exhausted*.' " *Fageol* noted "that specific insurance is exhausted 'when all that is *collectible* in respect to any given loss has been paid . . . when all that can be collected has been collected . . . .' " (*Ibid.*, italics added.)[6] *Fageol* concluded that primary insurance written with an insolvent carrier had been "exhausted" within the meaning of the policy and required the excess carrier to cover the loss.

 b. *The Associated policy language.*

 Associated argues the wording of its policy precludes a finding that it has a duty to "drop down."

---

[6]*McConnell* v. *Underwriters at Lloyds* (1961) 56 Cal.2d 637 [16 Cal.Rptr. 362, 365 P.2d 418], and *Fageol* both were decided before the Legislature enacted CIGA. (See Ins. Code, § 1063 et seq.)

One of the insuring agreements of the Associated policy provides, "In the event of reduction or exhaustion of the aggregate limits of liability applicable to the underlying insurance . . . *by reason of losses paid thereunder*, this policy shall, . . . , (A) in the event of reduction pay the excess of the reduced underlying limit; (B) in the event of exhaustion continue in force as underlying insurance." (Italics added.)[7]

### c. *Application of Reserve case to this language.*

Applying the rule of *Reserve* here, the Associated policy unambiguously contemplates "exhaustion" of the underlying insurance only by *payment* of the underlying limits either by the insured or its primary carrier. The Associated policy avoids the phrase "amount recoverable" found to be ambiguous by the *Reserve* court, as well as the unmodified term "exhausted" which the *Fageol* court construed to include exhaustion by insolvency.

Ledesma points out, and Associated concedes, that no California case has construed an excess policy which requires exhaustion by payment in the context of an insolvent primary carrier.

Ledesma's argument relies upon *Fageol* and *McConnell*. Neither citation is persuasive. *Fageol* is distinguishable because the excess policy there, as noted above, contained the unmodified term "exhausted."

*McConnell* similarly does not assist Ledesma. *Reserve* expressly disapproved *McConnell* to the extent it held an excess carrier "drops down" upon the insolvency of a primary insurer notwithstanding contract

---

[7] Although Associated opposed payment of the *Ledesma* judgment primarily on the basis Span had failed to give proper notice of the *Ledesma* action and had acted in a collusive fashion with Ledesma in obtaining the judgment, it also raised the nonperformance of condition "J" as a defense in its answer to the declaratory relief complaint and in its opposition to the motion for summary judgment. Condition "J" of the Associated policy reads, in part: "Liability under this policy with respect to any occurrence shall not attach unless and until the *insured, or* the insured's underlying insurer, shall have *paid* the amount of the underlying limits on account of such occurrence." (Italics added.) Because the trial court ordered Associated to pay the excess portion of the judgment without any proof Span or its insurer first had *paid* the underlying limit, the trial court impliedly found condition "J" unenforceable.

Our research has disclosed the routine appearance of language similar to condition "J" in excess coverage policies. (See, e.g., *Carrabba* v. *Employers Cas. Co.* (Tex.Ct.App. 1987) 742 S.W.2d 709, 713; *Peskin* v. *Liberty Mutual Ins. Co.* (1986) 214 N.J.Super. 686 [520 A.2d 852, 858], remanded on another point in later proceedings reported at (1987) 219 N.J.Super. 479 [530 A.2d 822].)

On appeal, Associated did not brief the enforceability of condition "J" and at oral argument Associated conceded it did not seek to enforce it literally. Rather, Associated now relies on condition "J" only to the extent it assists in the interpretation of the insuring provisions. We, therefore, need not determine whether condition "J" is unenforceable as against public policy. (See *Gulezian* v. *Lincoln Ins. Co.* (1987) 399 Mass. 606 [506 N.E.2d 123, 126].)

provisions to the contrary. Although the excess policy in *McConnell* contained some provisions respecting when liability attaches which also appear in the Associated policy, nothing in the *McConnell* case indicates the policy there required exhaustion by payment.

Ledesma also argues the Associated policy is ambiguous because it provides for exhaustion of underlying insurance by payment but makes no provision for any other type of exhaustion. Ledesma claims *Reserve* requires an excess policy to exclude the risk of the primary insurer's insolvency and failure to do so creates ambiguity.

Similar reasoning has been advanced in a Massachusetts case, *Gulezian* v. *Lincoln Ins. Co., supra*, 506 N.E.2d 123. The *Gulezian* court concluded: "It seems likely that Lincoln [the excess carrier] did not contemplate the insolvency of a scheduled underlying insurer in drafting its policy. The phenomenon of the insolvency of an insurer is not, however, so rare as to excuse that omission of attention to detail. The result is that Lincoln issued a policy in which it generated uncertainty as to what should happen on the insolvency of a primary insurer." (*Id.* at p. 126.)[8]

We empathize with the rationale of *Gulezian*. One reason for the failure of excess policies to provide for the insolvency of the primary carrier lies in the fact that the exhaustion by payment language has prevented "drop down" in every jurisdiction which has construed a policy with that phrase. Excess insurers understandably are loathe to deviate from terminology that has been accepted.

However, California law, as stated in *Reserve*, requires only that ambiguity be resolved in favor of the insured. It does not require the policy to make specific provision for the insolvency of the primary carrier. Because only *payment* of the underlying limit will trigger Associated's insuring agreement, insolvency of the primary carrier is excluded, indirectly, but unambiguously, as a means of exhaustion of the underlying policy.

We therefore agree with the numerous foreign cases which have concluded the phrase "exhaustion . . . by reason of losses paid thereunder," or similar language precludes an obligation of the excess insurer to drop down

---

[8] We note that at least one excess insurer writing policies in the state of Louisiana, possibly in response to the subsequently overruled decision of *Poirrier* v. *Cajun Insulation, Inc.* (La.Ct.App. 1986) 501 So.2d 800 (see fn. 9, *post*), now expressly addresses the insolvency of the primary carrier. (See *Robichaux* v. *Randolph* (La.Ct. 1990) 563 So.2d 226, 227-228 [" 'In the event there is no recovery available to the insured as a result of the bankruptcy or insolvency of the underlying Insurer, the coverage hereunder shall apply in excess of the applicable limit of liability specified in Schedule A.' "]; *Gibson* v. *Kreihs* (La.Ct.App. 1989) 538 So.2d 1057, 1059 [identical provision].)

upon the insolvency of the primary insurer. (*Mission Nat. Ins. Co.* v. *Duke Transp. Co., Inc.* (5th Cir. 1986) 792 F.2d 550, 553; *Molina* v. *United States Fire Ins. Co.* (4th Cir. 1978) 574 F.2d 1176, 1178; *Highlands Ins. Co.* v. *Gerber Products Co.* (D.Md. 1988) 702 F.Supp. 109, 113; *Guar. Nat. Ins. Co.* v. *Bayside Resort, Inc.* (D. V.I. 1986) 635 F.Supp. 1456, 1459; *U.S. Fire Ins.* v. *Capital Ford Tr. Sales* (1987) 257 Ga. 77 [355 S.E.2d 428, 432]; *Radar* v. *Duke Transp. Inc.* (La.Ct.App. 1986) 492 So.2d 532, 537.)

 d. *The adjective "collectible," as used in the Associated policy, does not create ambiguity.*

 (1) *References to "collectible" in the Associated policy.*

■ In Ledesma's reply brief he urges the appearance of the phrase "collectible insurance" in various places in the Associated policy creates ambiguity because insurance written by an insolvent carrier is not collectible.

The term "collectible" appears in a paragraph of the insuring agreements entitled "Each occurrence" which states in part: "[T]he company's liability shall be only for the ultimate net loss in excess of the insured's retained limits defined as the greater of: [¶] (A) an amount equal to the limits of liability indicated beside the underlying insurance listed in the schedule of underlying insurance hereof, plus applicable limits of any *other* underlying insurance *collectible by the insured*; . . ." (Italics added.)

The Associated policy lists only the Union policy with its limit of $500,000 on the schedule of underlying insurance.

The word "collectible" also appears in paragraph "L" of the policy which defines "*Other* Insurance" as follows: "If other valid and *collectible* insurance with any other insurer is available to the insured covering a loss also covered by this policy, other than insurance that is in excess of the insurance afforded by this policy, the insurance afforded by this policy shall be in excess of and shall not contribute with such other insurance." (Italics added.)

 (2) *Foreign authority unavailing to Ledesma.*

Ledesma cites numerous cases from foreign jurisdictions which have concluded that even though the phrase "collectible insurance" refers to "other insurance" and not to the underlying policy set forth on the schedule of underlying insurance, nonetheless an ambiguity is created as to whether the underlying policy, as well as any other insurance must be "collectible."

(*Alabama Ins. Guar.* v. *Magic City Trucking* (Ala. 1989) 547 So.2d 849, 854-856; *Gulezian* v. *Lincoln Ins. Co., supra*, 506 N.E.2d at pp. 125-126.)[9]

In *Alabama Ins. Guar.* v. *Magic City Trucking, supra*, 547 So.2d 849, the excess policy defined "ultimate net loss" in the same terms used in the "Each occurrence" paragraph of the Associated policy. The court reasoned " 'collectible by the insured' " "means that [the excess carrier] will provide coverage where the primary coverage is not collectible. If there is no collectible underlying coverage, then the excess coverage 'drops down' to fill the gap." (*Id.*, at p. 854.)

However, in a subsequent case, *Alabama Ins. Guar. Ass'n* v. *Kinder-Care* (Ala. 1989) 551 So.2d 286, the Alabama Supreme Court construed an excess policy which provided coverage upon " 'exhaustion of the applicable . . . underlying policy or policies *solely by reason of losses paid thereunder* . . . .' " (*Id.*, at p. 288.) The *Kinder-Care* court stated: "Unlike the policy involved in *Alabama Ins. Guar.* v. *Magic City Trucking Services, Inc., supra*, the policy in the case at bar does not utilize the term " 'collectible or similar language in its underlying limit provision, . . .' " (*Ibid.*)

Thus, it appears the Alabama Supreme Court construes excess policies which contain the words "any other underlying insurance collectible by the insured" as ambiguous, but similar policies with insuring agreements which include the phrase "exhaustion . . . by reason of payment of losses thereunder," as unambiguous.

The policy in *Gulezian* v. *Lincoln Ins. Co., supra*, 506 N.E.2d at page 124, defined ultimate net loss as that amount in excess of " 'the Underlying Insurance as stated in the Schedule of Underlying Insurance and the applicable limits of any other Underlying Insurance collectible by the Insured . . . .' " The *Gulezian* court did not find this policy term, taken alone, ambiguous.

As explained in *Highlands Ins. Co.* v. *Gerber Products Co.* (D.Md. 1988) 702 F. Supp. 109, 114, "[t]he only ambiguity found by the [*Gulezian*] Court arose from the fact that in the policy there under consideration 'applicable'

[9] Another case cited by Ledesma involved a policy which contained ambiguity of the sort found in *Reserve* and therefore is distinguishable. (*Donald B. MacNeal, Inc.* v. *Inter. Fire and Cas.* (1985) 132 Ill.App.3d 564 [477 N.E.2d 1322, 1323] [" 'amounts recoverable' "].)

Two other cases relied upon by Ledesma, *Werner Industries, Inc.* v. *First State Ins. Co.* (1987) 217 N.J.Super. 436 [526 A.2d 236], and *Poirrier* v. *Cajun Insulation, Inc., supra*, 501 So.2d 800, have been reversed. (See *Werner Industries, Inc.* v. *First State Ins. Co.* (1989) 112 N.J. 30 [548 A.2d 188, 192-193] and *Kelly* v. *Weil* (La. 1990) 563 So.2d 221, 226.)

A fourth case Ledesma cites, *Mission Nat. Ins. Co.* v. *Duke Transp. Co., Inc., supra*, 792 F.2d at pages 553-554, in fact rejects the argument he advances.

was used twice in the same sentence as 'collectible,' creating the possibility that the policy tended to equate 'applicable' with 'collectible.' [Citation.]"

In contrast to the authority cited by Ledesma, the majority of cases from other jurisdictions addressing policies which define "ultimate net loss" in terms of the excess of the limits of the underlying scheduled policy plus any *other* underlying insurance collectible by the insured do not find use of the word "collectible" ambiguous in this context. (*Steve D. Thompson Trucking* v. *Twin City Fire Ins., supra,* 832 F.2d at p. 311; *Zurich Ins. Co.* v. *Heil Co.* (7th Cir. 1987) 815 F.2d 1122, 1124-1125; *Mission Nat. Ins. Co.* v. *Duke Transp. Co., Inc., supra,* 792 F.2d at pp. 553-554; *Radiator Specialty Co.* v. *First State Ins. Co.* (W.D.N.C. 1987) 651 F.Supp 439, 441, affd. (4th Cir. 1987) 836 F.2d 193; *Kelly* v. *Weil, supra,* 563 So.2d at pp. 223-226; *U.S. Fire Ins.* v. *Capital Ford Tr. Sales, supra,* 355 S.E.2d at p. 433; *Value City, Inc.* v. *Integrity Ins. Co.* (1986) 30 Ohio App.3d 274 [508 N.E.2d 184, 187-188].)

Indicative of the reasoning of these cases is the following:

"[S]ince this excess-insurance policy repeatedly distinguishes between the underlying insurance policy and other insurance, and since it repeatedly states that other insurance must be collectible, but does not so state with respect to the underlying insurance . . . the insolvency of the underlying insurer does not require the excess insurer to [drop down] . . . ." (*U.S. Fire Ins.* v. *Capital Ford Tr. Sales, supra,* 355 S.E.2d at p. 433.)

Applying the rule of *Reserve* to the use of the term "collectible" in the Associated policy, we similarly conclude the language of the policy unambiguously employs that term not in connection with the underlying insurance set out on the schedule of underlying insurance (such as the Union policy), but with respect to any *other* underlying insurance collectible by the insured.

 e. *Wording of Associated's policy passes muster in California as it has in foreign jurisdictions.*

We conclude the language of Associated's excess policy is not ambiguous. It requires exhaustion of the underlying limit by payment before the excess insurer must respond. Exhaustion by insolvency is insufficient. Further, use of the term collectible to describe insurance *other* than the scheduled underlying Union policy does not mean the Union policy, likewise, must be collectible. Rather, the Union policy, or the limit of that policy, must be *paid*. Because neither phrase is ambiguous, the trial court properly resisted Ledesma's argument that Associated had to "drop down" to provide first dollar coverage.

### 3. *The breach of contract issues.*

The trial court's minute order indicates it based its ruling upon "Associated's failure to defend a case of which they were demonstrably aware." The trial court refused "to reward Associated for [its] own negligence at the expense of an innocent plaintiff."

Associated contends the trial court's ruling failed to distinguish notice of a claim from notice that a claim might invade the excess layer of coverage, and, in any event, the presence of a triable issue of fact on the issue of collusion precludes summary judgment. Associated claims the evidence shows Span affirmatively misled Associated as to the potential liability in the *Ledesma* action.

Ledesma relies, inter alia, upon the rule that an insurer which denies a tender of defense and coverage is not entitled to further notice of the proceedings. (*Samson* v. *Transamerica Ins. Co.* (1981) 30 Cal.3d 220, 238 [178 Cal.Rptr. 343, 636 P.2d 32]; *Downey Savings & Loan Assn.* v. *Ohio Casualty Ins. Co.* (1987) 189 Cal.App.3d 1072, 1088 [234 Cal.Rptr. 835].) He reasons that once Span filed the declaratory relief action against Associated, Span had no further duty to provide notice of the *Ledesma* action to Associated.

As will be discussed, because the evidence before the trial court on the notice issue was not in dispute, the trial court appropriately ruled on the question as one of law. However, the trial court improperly made factual determinations necessary to resolve the collusion issue.

#### a. *Associated had constructive notice the Ledesma action was likely to involve its layer of coverage.*

The standard notice provision, condition "G" of the Associated policy, states: "Whenever the insured has information from which the insured may reasonably conclude that an occurrence covered hereunder involves injuries or damages which in the event that the insured should be liable, are likely to involve this policy, notice shall be sent to the company as soon as practicable, provided, however, that failure to give notice of any occurrence which at the time of its happening did not appear to involve this policy but which, at a later date, would appear to give rise to claims hereunder, shall not prejudice such claims."

Associated contends it did not receive the notice required by condition "G." Ledesma counters Associated had adequate notice three years before trial.

■ Although the issue of notice to an excess insurer usually involves a factual determination (*Trustees of Univ. of Pa.* v. *Lexington Ins. Co.* (3d Cir. 1987) 815 F.2d 890, 895), the question has been resolved as one of law where notice to the excess carrier "was wholly inadequate to permit [the carrier] to investigate and exercise, if it so elected, the rights reserved to it under the policy." (*Greyhound Corp.* v. *Excess Insurance Co. of America* (5th Cir. 1956) 233 F.2d 630, 636.)

Notwithstanding Span's obligation to notify Associated properly, once Associated is shown to have actual notice of the *Ledesma* action, a factual question arises as to whether Associated is to be charged with constructive notice of facts which, *by inquiry*, it might have learned.

Civil Code section 19 provides: "Every person who has actual notice of circumstances sufficient to put a prudent [person] upon inquiry as to a particular fact, has constructive notice of the fact itself in all cases in which, by prosecuting such inquiry, he [or she] might have learned such fact."

■ "[G]iven the appropriate circumstances, the law will charge a party with notice of all those facts which he [or she] might have ascertained had [he or she] diligently pursued the requisite inquiry." (*California Shoppers, Inc.* v. *Royal Globe Ins. Co.* (1985) 175 Cal.App.3d 1, 37 [221 Cal.Rptr. 171].)

■ The trial court's ruling turned on its factual finding that Span had notified Associated and Associated had failed to make reasonable inquiry.[10] In order to determine whether this finding was proper, we look to a statement of the applicable rule in a slightly different context.

"It is generally established, and we shall not pause to refer to the authorities, that what constitutes *cooperation* (or lack of it) on the part of the assured, . . . , is ordinarily a question of fact. This is so because a dispute normally exists as to the actual statements and conduct of the assured in the premises or because of the existence of an uncertainty as to the intent or motive underlying [the] statements or conduct. But where, as here, the evidence addressed to the failure to cooperate is not materially in dispute . . . the issue became one of law . . . ." (*Valladao* v. *Fireman's Fund Indem. Co.* (1939) 13 Cal.2d 322, 330 [89 P.2d 643], italics added.)

---

[10]The trial court stated: "Well I don't read Mr. Hogan's letter of October 31, . . . , as telling you that you don't have exposure . . . . [H]e ends by saying he trusts you will act promptly for the protection of your insured. [¶] I recognize that[,] . . . in an adjuster's mind, these claims would fall within the Five Hundred Thousand, but certainly stranger things have happened with juries. And given the possibility of high general damages, it can't be stated with certainty that you did not have exposure."

Here, the parties do not dispute the facts and there is no issue of credibility. Because the issue thus joined is one of application of law to settled facts, it properly may be determined on a motion for summary judgment.

We therefore conclude, as a matter of law, that Associated's knowledge of the *Ledesma* action and the insolvency of the primary carrier placed it on inquiry notice of the contents of the superior court file in the *Ledesma* action. Simple review thereof would have alerted Associated that Ledesma had filed a statement of damages seeking $1 million in general and $1 million in special damages, a demand for settlement in the amount of $650,000, and that Ledesma's damages had been described as "extensive" in an arbitration conference.

Where the excess insurer is on notice the primary insurer is insolvent, an increased duty to inquire arises because the ordinary presumption that the primary carrier will "provide an experienced defense" (*Trustees of Univ. of Pa.* v. *Lexington Ins. Co., supra,* 815 F.2d at p. 898), no longer applies. Because Associated failed to make prudent inquiry, it cannot now complain it received improper notice.

We affirm the trial court's ruling in favor of Ledesma on this point; therefore, we need not consider Ledesma's assertion that Associated must prove substantial prejudice arising from the asserted lack of notice. (*Clemmer* v. *Hartford Insurance Co.* (1978) 22 Cal.3d 865, 881-882 [151 Cal.Rptr. 285, 587 P.2d 1098]; *Valladao* v. *Fireman's Fund Indemnity Co., supra,* 13 Cal.2d at p. 331; *Downey Savings & Loan Assn.* v. *Ohio Casualty Ins. Co., supra,* 189 Cal.App.3d at p. 1088.)

b. *The presence of a triable issue of material fact precludes summary judgment on the collusion issue.*

A finding adverse to Associated on the notice issue, under normal circumstances, would require it to pay the judgment in the *Ledesma* action within its limits. (*Samson* v. *Transamerica Ins. Co., supra,* 30 Cal.3d 220, 239.) However, here we must address the further issue of whether the parties obtained the judgment in the *Ledesma* action in a fraudulent or collusive manner.

Associated may assert this defense against Ledesma because "[a]s against the injured person an insurer may assert a defense based on breach by the insured of the cooperation clause of the policy. [Citations.]" (*United Service Automobile Assn.* v. *Martin* (1981) 120 Cal.App.3d 963, 965 [174 Cal.Rptr. 835].) Collusive assistance in the procurement of a judgment not only constitutes a breach of the cooperation clause but also is a breach of the covenant of good faith and fair dealing. "[A] duty of good faith and fair

dealing in an insurance policy is a two-way street, running from the insured to his insurer as well as vice versa [citations.]" (*Commercial Union Assurance Companies* v. *Safeway Stores, Inc.* (1980) 26 Cal.3d 912, 918 [164 Cal.Rptr. 709, 610 P.2d 1038].)

■ Collusion in this context is not necessarily tantamount to the tort of fraud in that there need not be a misrepresentation of a material fact. "Collusion has been variously defined as (1) 'a deceitful agreement or compact between two or more persons, for the one party to bring an action against the other for some evil purpose, as to defraud a third party of his right'; (2) 'a secret arrangement between two or more persons, whose interests are apparently conflicting, to make use of the forms and proceedings of law in order to defraud a third person, or to obtain that which justice would not give them, by deceiving a court or its officers'; and (3) 'a secret combination, conspiracy, or concert of action between two or more persons for fraudulent or deceitful purposes.' [Citation.]" (*Hone* v. *Climatrol Industries, Inc.* (1976) 59 Cal.App.3d 513, 522, fn. 4 [130 Cal.Rptr. 770].)

■ What constitutes collusion will differ with each fact situation. However, it appears the evidence presented to the trial court with respect to the manner in which the *Ledesma* action was tried raised a material issue of triable fact.

The trial court acknowledged the presence of this issue when it stated: "There is no question in my mind, . . . that Mr. Harris [Span's trial counsel] consciously or unconsciously—and I would not presume to say which—effectively sold [Associated] down the river." Notwithstanding this evaluation, the trial court later stated it did not "read any collusion into the evidence that has been presented to this court."

These divergent views on the subject underscore the presence of a triable issue of fact.

In seeking to avoid reversal on the collusion issue, Ledesma argues *Samson* held a judgment entered without cross-examination and without presentation of a defense is not necessarily collusive. However, in *Samson* the insured had no defense to the underlying wrongful death action because he had pleaded guilty to vehicular manslaughter in connection with the underlying traffic accident. The *Samson* court noted the insured need not present a useless defense and concluded there was no evidence the damages awarded for wrongful death in that case, $725,000, were excessive or invalid. (*Samson* v. *Transamerica Ins. Co.*, supra, 30 Cal.3d at p. 242.)

Here, on the other hand, there is nothing in the record which indicates a defense of the *Ledesma* action would have been useless or futile.

Ledesma also claims the manner in which the parties tried the *Ledesma* action complied with local court rules designed to expedite trials. However, the transcript indicates the trial also lacked the attributes of an adversary proceeding in a case which involved damages in excess of $1 million.

 Because this evidence demonstrated the presence of a triable issue of material fact on the issue of collusion, the summary adjudication of that issue in favor of Ledesma must be reversed.[11]

## CONCLUSION

The trial court properly determined the excess policy did not obligate Associated to provide first dollar coverage upon Union's insolvency; Associated's liability for the judgment in the *Ledesma* action is limited to its excess coverage only. We also affirm the trial court's ruling that Associated had constructive notice the *Ledesma* action was likely to invade its policy limits.

However, factual issues remain respecting whether the parties tried the *Ledesma* action collusively and thereby tainted Ledesma's recovery. As to this issue the grant of summary judgment must be reversed.

## DISPOSITION

The trial court's summary adjudication of the contract interpretation and notice issues are affirmed. As to the collusion issue, the judgment is reversed and remanded for further proceedings consistent with the views expressed herein.

---

[11] We note, as did the trial court, that Associated could have attempted to set aside the judgment as collusive in the *Ledesma* action.

On appeal, Ledesma argues an action for declaratory relief is the proper vehicle to attack a judgment as collusive. It appears the correct rule is that either means is appropriate. (*Villarruel* v. *Arreola* (1977) 66 Cal.App.3d 309, 317-318 [136 Cal.Rptr. 19]; *Sunseri* v. *Camperos Del Valle Stables, Inc.* (1986) 185 Cal.App.3d 559, 561-562 [230 Cal.Rptr. 23].)

Each party to bear respective costs on appeal.

Croskey, J., and Hinz, J., concurred.

A petition for a rehearing was denied February 27, 1991, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied April 25, 1991.