# Wytheville

MARION L. DAWSON, ET ALS. V. ALICE V. HOTCHKISS, ET ALS.

June 15, 1933.

Present, All the Justices.

The opinion states the case.

*Christian & Lamb* and *Winston Montague,* for the appellants.

*T. Justin Moore,* for the appellees.

BROWNING, J., delivered the opinion of the court.

This is a suit for specific performance of an alleged contract to purchase real estate in the city of Richmond from the appellants by the appellees.

The real estate belonged to all the litigants here as tenants in common. They inherited it from their common ancestor, P. H. S. Dawson, and their respective undivided shares were determined in a chancery suit instituted for the purpose. After these rights were fixed appropriate pleadings were filed in the suit designed to partition the subject in one of the methods provided by law. The cause was referred to a commisisoner for his report on the matter and

while this was in progress negotiations were undertaken by the attorneys of the respective parties with the purpose in view of having one or the other of the two groups purchase the property and thus by such treaty to obviate the necessity of the expense incident to any other mode of partition. Montague & Son were the attorneys of record in the chancery suit for the Dawsons,. Mr. Hill Montague being the active participant. Mrs. Hotchkiss and Mr. Starke were represented in the suit by the firm of Scott, Lloyd and Scott, attorneys, Mr. Robert E. Scott having the active charge of the litigation. The firm of Christian & Lamb subsequently came into the matter for the Dawsons as associate attorneys. The negotiations referred to were had between Mr. Hill Montague and Mr. Robert E. Scott. They consisted of letters passing between them and personal interviews by 'phone and office visits. The Dawsons claim that these letters constitute a contract between themselves and Mrs. Hotchkiss and Mr. Starke by which the two latter are bound to them to purchase their one-half interest in the Richmond real estate at the price of $75,000.00 and the moiety of Mrs. Hotchkiss and Mr. Starke in a tract of seventy-five acres of land in the county of Albemarle. This claim is resisted by the contention of Mrs. Hotchkiss and Mr. Starke that they did not enter into such an agreement, that the letters and interviews do not establish it, and that, if they do, Mr. Scott had no authority of any sort to bind them in the matter.

The Dawsons filed a petition in the chancery cause asserting the validity of the agreement in all respects and in effect praying for its specific performance by appropriate decrees to be therein entered.

Mrs. Hotchkiss and Mr. Starke answered the petition denying that Mr. Scott was acting, or that he represented that he was acting, as their agent, in engaging in the negotiations, with authority to act for and bind them, but that he was acting largely as a self-appointed intermediary, in a mutual effort between all counsel to reach a tentative basis

for settlement, subject to their final approval or rejection, and that this was known to Mr. Montague or should have been known and understood by him.

Mrs. Hotchkiss averred that he had no authority as to her rights except to undertake to reach a tentative basis for settlement with the Dawsons, subject to her final approval and then contingent upon Mr. Starke agreeing to join her in whatever agreement might be reached. Mr. Starke affirmed that Mr. Scott had no authority of any kind to act for him in the matter and that in undertaking to reach a basis for a settlement of his rights he was acting wholly as a self-appointed intermediary in the hope that he would be able to induce him to accept such basis of settlement as might be tentatively agreed upon, although Mr. Scott knew that he, Mr. Starke, desired to sell rather than buy, or desired the entire property to be sold, under the decree of the court, which had been entered in the suit, and the proceeds divided among the parties.

The answer then set out in more detail the defense of the respondents. The chancellor then heard the matter. The witnesses were examined *ore tenus* before him and the voluminous correspondence, in the form of exhibits, was considered by him. He denied the relief prayed for, holding that there was no contract in writing or any memorandum thereof, signed by Alice S. Hotchkiss and Ashton Starke, or by their authorized agents, and that therefore petitioners were not entitled to specific performance.

He delivered a brief but conclusive opinion which is as follows: "Having carefully considered the relation of Robert E. Scott to the defendants, Hotchkiss and Starke, and the evidence of Robert E. Scott, Ashton Starke and H. S. Hotchkiss, I am of the opinion that Robert E. Scott had no authority, express or implied, to sign a contract in writing, binding the defendants, either to sell or to buy the property under consideration.

"Therefore the prayer for specific performance must be denied."

■ We think the crux of the situation was reached by the chancellor and correctly determined by him. That his conclusion is entitled to great weight is beyond cavil. As trier of the facts he had all of the evidence before him. He saw and heard the witnesses relate the circumstances primarily and under the stress of cross-interrogation, and from this vantage ground he perceived the pivotal point and tersely and concisely expressed it, and this is dispositive of the issue.

We do not deem it necessary to recite the evidence with great particularity or to incorporate in this opinion the numerous letters appearing in the record. It is patent that the evidence does not show that either Mrs. Hotchkiss or Mr. Starke by any communication, verbal or otherwise, ever informed the appellants, or any of them, or their attorneys or either of them, that Mr. Scott had authority to make a settlement for them by purchase or otherwise. The letters, of June 18, 1930, June 20, 1930, and July 1, 1930, from Mr. Scott to Hill Montague and Montague & Son, and that of the attorneys for the Dawsons of July 2, 1930, which are those alleged to constitute the contract, do not conclusively show such authority. The testimony of the witnesses preponderatingly negative such authority, and we think shows that Mr. Montague was charged with notice that the existence of such authority in Mr. Scott was so nebulous and so questionable as to affect him with knowledge that he was dealing at his peril, and that then ensued his duty to satisfy himself by inquiry or in some other fashion that such authority really existed. No such authority inhered in Mr. Scott as attorney for Hotchkiss and Starke in the chancery suit.

This contention, if it be one, which is not entirely clear, may be set at rest by the following citations:

■ "The general rule is now well settled that an attorney has no power, by mere virtue of his retainer and without express authority, to bind his client by a compromise of a pending suit or other matter intrusted to his care; and

where he makes such a compromise, the client may ignore it and proceed with the suit or institute a new suit as if no such compromise had ever been made; or he may have the compromise set aside by the court and the case reinstated." 3 Amer. & Eng. Ency. of Law (2nd ed.) page 358.

"An executory agreement to compromise or settle the case, made by an attorney, does not bind a client, unless ratified by the client after full knowledge of the facts." 6 Corpus Juris, page 660. See, also, *Cady* v. *Straus,* 97 Va. 701, 34 S. E. 615; *Smock* v. *Dade,* 5 Rand. (26 Va.) 639, 16 Am. Dec. 780; *Paxton* v. *Steele's Adm'r,* 86 Va. 311, 10 S. E. 1.

Now considering the evidence we may say that counsel for the appellants, in argument in their briefs, urge that it is of little moment for the reason that the letters show the soundness of their contention. It will, however, be noted that Mr. Montague was called as a witness and when the letters were introduced he was interrogated by them and his version of every phase of the matter was elicited and secured. At that juncture they deemed it important to their case.

We now turn upon the questions of the actual and apparent authority of Mr. Scott in the matter, the light which is shed by the evidence, written as well as spoken. In the incipiency of the matter of the expedition of the settlement of the estate, Mr. Starke wrote two letters to Mr. Hill Montague, the first dated September 16, 1929, in which he asked if there was anything in the way of an immediate settlement of the Dawson estate. Surely he did not then hold out Mr. Scott as representing him in the matter, indeed Mr. Scott was not mentioned in the letter. Mr. Montague promptly replied to the letter saying that his firm and Messrs. Christian & Lamb were co-operating with his (Starke's) counsel "in getting matters arranged as speedily as possible," and referred him to his counsel, Scott, Lloyd & Scott, for "further information as to the partition suit."

Starke's second letter to Montague, dated September 18, 1929, informed him that he had written Mr. Robert E. Scott a letter which is in part in these words: "Which I trust may suggest *an expediting of the division* of the estate of P. H. Dawson, and which perhaps he may submit to you and Messrs. Christian & Lamb."

It is notable that in neither of these letters is Mr. Scott referred to as possessing authority to act for Mr. Starke and he only comes into the picture after Mr. Montague refers Mr. Starke to him as the source from which he might get the information he was seeking. Nearly a month later Mr. Montague addressed a letter to the Scott firm in which he referred to a telephone conversation previously had with Mr. Robert E. Scott in which he (Scott) said that Mrs. Hotchkiss and Mr. Starke would take over by allotment the remaining real estate if an agreement could be reached as to its valuation. No reply to this letter came from Mr. Scott until a second letter on the subject was dispatched to him by Mr. Montague, and when Mr. Scott replied, a month and a half after receipt of the first letter, he said he would "be glad to take the matter up with Mrs. Hotchkiss and Mr. Starke."

The thing seemed to remain dormant until May 12, 1930, when Mr. Starke wrote to one of the appellants, Dr. Edgar Dawson, a lengthy letter, again on the question of expediting the settlement, as to which he suggested three methods of disposition: The first, a distribution of the properties based on values; the second, selling them and dividing the proceeds, and third, "one party in interest buying the other party's interest." It is also to be observed that no mention is made of Mr. Scott as the writer's attorney, agent or intermediary in the accomplishment of his purpose. Mr. Starke in this letter tells Dr. Dawson that he has written to his brother, Mr. John Dawson of San Diego, California, on the same subject.

On May 16, 1930, Mr. Starke wrote a second letter to Dr. Dawson which was in reply to one written him by the doctor

on May 13, 1930. The Dawson letter was in part as follows: "You may remember that we offered to buy-or-sell at a price. That offer was *rejected* for reasons that were doubtless good, but which I do not remember to have heard. It is possible that if you made a buy-or-sell offer to Mr. Montague he would advise us to act at once."

Mr. Starke's reply to this, above referred to, was as follows: "Thank you for your letter of the 13th instant. If 'an offer to buy or sell at a fair price,' the properties belonging to the Dawson estate, has ever been made, my memory fails me, and it would be interesting to know *when and through whom.*

"However it does not matter and for my part the facts that up to a year or two since I owned fourteen pieces of real estate in Richmond, and have sold all but one parcel and am now offering it at the value placed upon it for taxation, by the city, tells of my disposition.

"I will follow your suggestion by *getting in touch with Mr. Montague* and do what I can to bring about a *settlement and distribution* of the estate in question." (Italics ours.)

This last letter shows perfectly clearly the attitude of Mr. Starke. He knew nothing of a buy or sell offer at a fair price and he is interested to know the source of it. "When and through whom" did it come? This letter and Mr. Starke's testimony show that Mr. Starke wanted to sell rather than buy. In his anxiety to have the distribution of the estate closed he said he would get in touch with Mr. Montague, not Mr. Scott. This does not comport with the contention that Mr. Scott was his representative in the matter or that he was holding him out to be. The whole tenor of these letters is impressive as pointing to the fact that the writer was attending to this end of the business personally and not through the offices of any third party.

Copies of Dr. Dawson's letters and the originals of Mr. Starke's were promptly sent to Mr. Montague so that he was perfectly cognizant of them and their import. It is worthy of remark that in one month after Mr. Montague came into

possession of the last letter of Mr. Starke to Dr. Dawson, the letter of Mr. Scott to Mr. Montague, of June 18, 1930, which is cited as the first important link in the chain which formed in the end an alleged binding contract, was written. The point is, can it be perceived that one of Mr. Starke's temperament and strength of conviction had so completely reversed himself in so short a time!

So much for the letters. We now turn briefly to the evidence. Mr. Montague testified that he went to see Mr. Henry Hotchkiss on June 10, 1930, and talked with him about the offers and counter-offers, and that Hotchkiss said in effect that his uncle, Mr. Starke, was unwilling to accede to them, and that he expected shortly to go up to Albemarle county to see if he "could not get him straightened out."

Mr. Montague admitted that Mr. Scott told him that he "was having difficulty with Starke."

Again Mr. Montague said in his testimony, "I got the decided impression in the negotiations that Mr. Henry Hotchkiss was representing Mr. Starke." According to Mr. Montague, Mr. Hotchkiss had informed him that he was the only member of the immediate family who was in a position to talk with or confer with Mr. Starke."

It is true that Mr. Montague testified that he never questioned Mr. Scott's authority and that his understanding was that Mr. Scott was clothed with the power to act in the premises but certainly to our minds the weight of the evidence negatives the fact that Mr. Scott, in reality, possessed such authority, though Mr. Montague's sincerity is not questioned.

With reference to an interview with Mr. Henry Hotchkiss sometime between May 6th and early in July of 1930, Mr. Montague testified as follows: "I merely stated that if he could wind up the whole case by Mr. Hotchkiss and Mr. Starke taking the half interest of the Dawsons in the real estate I would be disposed to waive the exception I had filed as to the allowance of the commissions."

This concession to Hotchkiss, to have him try to effect

the thing which the appellants contend Mr. Scott had the authority and power to do, is in decided clash with the contention.

The testimony of Mr. Scott, Mr. Henry Hotchkiss, Mr. Elmore Hotchkiss and Mr. E. D. Hotchkiss is overwhelming that the only authority which Mr. Scott had was to negotiate for a basis of settlement subject to submission to his clients for their final action. Mr. Starke's testimony was that Mr. Scott had no authority to act for him at all.

On the 14th of July, 1930, after the whole thing had toppled, Mr. Scott wrote Mr. Starke a letter of some severity in which the writer gave his interpretations of the effect of the negotiations which was favorable to the views of the appellants. We do not attach great importance to it. It was written when the author was naturally smarting under the causticisms of Mr. Starke.

The evidence rather reveals both Mr. Starke and Mr. Scott as types of person who do not brook heated opposition with that urbanity which characterizes those of less positive natures. Mr. Scott, without sufficient authority, went to the brink of the thing in his negotiations, and when Mr. Starke halted them there, as it seems to us, he had the right to do, under the facts and circumstances present, the letter of Mr. Scott was a somewhat indignant defense of his own doings. In testifying of this letter and its effect, Mr. Scott, with characteristic candor said: "* * * if I had recalled those decisions I would not have written that letter, and I think now that I did Mr. Starke an injustice."

We do not think, in the light of all the facts and circumstances shown by the evidence, that Mr. Scott had the actual or the apparent authority to make a binding contract for the appellees. The judgment of the chancellor was clearly right. It becomes unnecessary for us to discuss the many and kindred questions raised and so ably argued.

We affirm the decree.

*Affirmed.*