[No. E007345. Fourth Dist., Div. Two. June 26, 1991.]

HARBOR INSURANCE COMPANY, Plaintiff and Respondent, v.
CITY OF ONTARIO et al., Defendants and Appellants.

928

---

**COUNSEL**

Lynberg & Watkins and William W. Read for Defendants and Appellants.

Archer, McComas & Lageson, H. Paul Breslin, W. Eric Blumhardt and Eugene C. Blackard for Plaintiff and Respondent.

## Opinion

**McDANIEL, J.***—The action underlying this appeal is one for declaratory relief brought by Harbor Insurance Company (plaintiff) against its insured, City of Ontario (defendant), to resolve a single issue. That issue is whether defendant insured is required to contribute its self-insured retention after it gave plaintiff insurer its permission but not its agreement to settle a third party action filed against defendant for the wrongful death of James Belyeu. The trial court determined that defendant was legally obligated to contribute to the settlement, and a summary judgment reflecting this determination was entered accordingly. In our view, on the undisputed facts and the pertinent language of the insurance policy in question, the trial court correctly resolved the issue, and so we shall affirm the judgment.

### Synopsis of Trial Court Proceedings

When defendant refused to contribute its self-insured retention, after settlement of the third party action, for which it had given its "permission," but not its "agreement," plaintiff filed suit for declaratory relief. After the case was at issue, plaintiff gave notice of motion for summary judgment; defendant countered with its own such motion. Before the date set for hearing the cross-motions, the parties entered into a stipulation re: undisputed facts. Because the contents of this stipulation disclose a usable factual predicate for the sole legal issue presented, we quote such contents in their substantial entirety.

"1. James Ogden Belyeu died as a result of injuries sustained in a vehicular collision which occurred at the intersection of Vineyard Avenue and 'G' Street in the City of Ontario, California[,] on or about September 24, 1985.

"2. On August 14, 1986, plaintiffs Linda Belyeu and James Allen Belyeu (by and through his guardian ad litem, Linda Belyeu) filed their First Amended Complaint for Damages against the City of Ontario and others in the Superior Court of the State of California, In and For the County of San Bernardino, Case No. OCV 37837.

"3. Harbor Insurance Company issued its umbrella liability policy No. HI 207679 to the City of Ontario for the policy period extending from April 6, 1985[,] to April 6, 1986. A true and correct copy of the policy is attached to this stipulation as Exhibit 'A.'

---

*Retired Associate Justice of the Court of Appeal, Fourth District, sitting under assignment by the Chairperson of the Judicial Council.

"4. The limits of liability set forth in the policy are in the amount of $1,000,000.00 per occurrence and in the aggregate. The policy also provides for a $100,000.00 self[-]insured retention.

"5. The CITY OF ONTARIO paid a $145,843 premium for the Harbor umbrella policy No. HI 207679.

"6. Under the terms of the HARBOR policy, the total amount of costs incurred by the CITY OF ONTARIO in defending the underlying Belyeu action is applied against the City's self-insured retention. The CITY OF ONTARIO expended $41,244.48 in defense of the Belyeu action, resulting in an adjustment of the self[-]insured retention from $100,000.00 to $58,755.52 ($100,000.00 minus $41,244.48).

"7. Trial in the Belyeu action was scheduled to commence on December 11, 1987.

"8. Prior to trial, defense counsel for the CITY OF ONTARIO evaluated the case as being one in which the City had a 20-30% chance of obtaining a defense verdict. Defense counsel evaluated the potential exposure to the CITY OF ONTARIO as being in excess of $1,000,000.00 and possibly as high as $2,000,000.00.

"9. On November 25, 1987, James R. Inman, Senior Claims Auditor for HARBOR INSURANCE COMPANY, wrote to Mr. Gene Hughart, Risk Manager for the CITY OF ONTARIO advising that the attorney representing the Belyeu family had stated that the case could be settled for $400,000.00, further advising that HARBOR was prepared to 'pay all sums in excess of Ontario's self-insured retention' and requesting that the City 'confirm (its) willingness to commit the balance of (Ontario's) SIR' to settle the Belyeu claim . . . .

"10. On December 2, 1987, counsel for the CITY OF ONTARIO replied to Mr. Inman's letter and advised that the City Council had considered settlement of the Belyeu claim in a closed session of its regular meeting on December 1, 1987 and had decided not to contribute the remainder of its self[-]insured retention toward settlement of the Belyeu claim . . . .

"11. Despite the CITY OF ONTARIO's decision not to contribute the remainder of its self-insured retention toward settlement of the Belyeu claim, ONTARIO gave HARBOR permission to settle the Belyeu action for up to $400,000.00.

"12. Legal counsel for the CITY OF ONTARIO regarded settlement of the Belyeu action at or near $400,000.00 to be reasonable.

"13. On or about December 7, 1987[,] the Belyeu litigation was settled for $360,000.00. HARBOR funded the entire amount of that settlement and reserved its right to file the within action to recoup the $100,000.00 self[-]insured retention less the amount expended by the CITY OF ONTARIO in defending the Belyeu action.

"14. The CITY OF ONTARIO did not contribute any money to the settlement of the Belyeu action.

"15. Under the terms and conditions of the HARBOR policy, had the Belyeu action resulted in a verdict greater than $100,000.00 but less than $1,000,000.00, ONTARIO's maximum pecuniary obligation would have been to pay the $100,000.00 self[-]insured retention less the amount spent in defense of the Belyeu case, with the remainder of the verdict being satisfied by HARBOR.

"16. The CITY OF ONTARIO maintained no underlying insurance to the HARBOR umbrella liability policy No. HI 207679.

"17. Condition H as set forth in the HARBOR policy contains the following 'Assistance and Cooperation' clause:

'The Company shall not be called upon to assume charge of the settlement or defense of any claim made or suit brought or proceeding instituted against the Insured, but the Company shall have the right and shall be given the opportunity to associate with the Insured or the Insured's underlying insurers, or both, in the defense and control of any claim, suit or proceeding relative to an occurrence where the claim or suit involves, or appears reasonably likely to involve the Company, in which event the Insured and the Company shall co-operate in all things in the defense of such claim, suit or proceeding.'

"18. Under the terms and conditions of the HARBOR POLICY, had the Belyeu action resulted in a verdict greater than $1,000,000.00, Harbor's maximum obligation would have been to pay its policy limits of $1,000,000.00, less the amount of the adjusted self[-]insured retention."

Otherwise, a copy of the umbrella policy was attached as an exhibit to certain of the filings made in support of the several motions for summary judgment. Within that policy is a grouping entitled "INSURING AGREE-MENTS," and under that heading is a grouping entitled "2. LIMIT OF LIABIL-ITY." One of the endorsements to the policy was directed to subparagraph (B) of the latter grouping. The language of the endorsement reads, "(B)

$100,000. Ultimate net loss in respect of each occurrence not covered by said underlying insurance. (Hereinafter called the 'underlying limits.')"

Also included in the policy is the definition of "ULTIMATE NET LOSS." Such definition reads: "The term 'ULTIMATE NET LOSS' shall mean the total sum which the insured, or his Underlying Insurers as scheduled, or both, become obligated to pay by reason of personal injuries, property damage or advertising liability claims, either through adjudication or compromise, and shall also include hospital, medical and funeral charges and all sums paid as salaries, wages, compensation, fees, charges and law costs, premiums on attachment or appeal bonds, interest, expenses for doctors, lawyers, nurses and investigators and other persons, and for litigation, settlement, under the terms of this Policy; nor shall the terms of this Policy be waived or changed, except by endorsement issued to form a part hereof, signed by an authorized representative of the Company."

With these undisputed facts before it, the trial court denied defendant's motion. As for plaintiff's motion, the court made a summary adjudication that, "Harbor is entitled to reimbursement from Ontario in the amount of Ontario's $100,000 self-insured retention minus $41,244.48 expended by Ontario in defending the Belyeu action." Such action left for resolution the issue of whether plaintiff had made a timely demand upon defendant to participate in the settlement. This second issue was later disposed of by stipulation to enable entry of a final, appealable judgment. Such judgment was entered, and this appeal followed.

### DISCUSSION

In pursuing its appeal, defendant characterizes its challenge to the judgment in the form of two questions. They are: "[¶] A. Does California Law Require A Self-Insured Entity To Contribute Its Self-Insured Retention To Settle A Claim On The Demand Of An Excess Carrier Absent Policy Language To That Effect? [¶] B. Does The Language Of The Harbor Policy Require Ontario To Contribute Its Self-Insured Retention When Harbor Unilaterally Decides To Settle A Claim?"

In its response to the appeal, plaintiff does not deal directly with the questions posed by defendant. We share plaintiff's implicit view that the record does not present two separate questions. ■ More accurately and concisely stated, we see the issue to be resolved as this: given the language of the policy and the undisputed facts leading to the settlement, is defendant legally required to contribute its self-insured retention toward settlement of the third party action?

What is called for is the interpretation of a particular insurance policy. In plain terms, defendant has chosen to cover its public liability risk exposure with a policy under which it would be self-insured for the first $100,000 of such exposure.

Among other contentions, defendant argues, because the policy language does not explicitly *require* it to contribute under the circumstances here obtaining, that the policy is at best ambiguous and thus the issue must be resolved against the insurer, citing *Crane* v. *State Farm Fire & Cas. Co.* (1971) 5 Cal.3d 112 [95 Cal.Rptr. 513, 485 P.2d 1129, 48 A.L.R.3d 1089]. This latter argument begs the question.

In our view, the language of the policy, where applicable, is clear and unambiguous. ■ In such a circumstance, the court is entitled and duty-bound to make its own independent determination of the meaning of the policy language. (*Farmers Ins. Exchange* v. *Galvin* (1985) 170 Cal.App.3d 1018, 1021 [216 Cal.Rptr. 844].) Moreover, the words used in an insurance policy are to be construed according to their plain meaning. (*Reserve Insurance Co.* v. *Pisciotta* (1982) 30 Cal.3d 800, 807 [180 Cal.Rptr. 628, 640 P.2d 764].) Moreover, in *Reserve*, the Supreme Court said, "[c]ourts will not adopt a strained or absurd interpretation in order to create an ambiguity where none exists." (*Id.* at p. 807.)

■ Reduced to its simplest recital, defendant's position, in justifying its refusal to participate in the settlement is this: although it may have given its "permission" to plaintiff to settle, it did not "agree" to the settlement so as to commit its self-insured retention. In other words, according to defendant's counsel at oral argument, defendant was willing to go to trial to test an issue of governmental immunity. However, if plaintiff wished to settle at a figure extending only 40 percent into its excess coverage, defendant's further position was that plaintiff was free to do so, but nevertheless without defendant's self-insured retention.

To elaborate, as stated in defendant's brief, "It was undisputed that the City did cooperate with Harbor in the defense of the case. The City provided Harbor with its attorney's evaluation of the case, including an evaluation of the chances of prevailing and the likely exposure in the event the City did not prevail. The City did not object when Harbor announced its intention to settle the Belyeu Claim, save to refuse to contribute any money. Nothing contained in the Harbor Policy gave the City the right to deprive Harbor of the chance to settle the claim. While the City was willing to risk not only the remainder of its self-insured retention, but any exposure in excess of Harbor's limits, to test its immunities at trial, the City also recognized that

Harbor might prefer the security of a settlement whereby Harbor's liability would be limited."

Disposition of the appeal thus requires an interpretation of condition H, in light of the insuring agreements of the policy, and application of that interpretation to the undisputed facts. In our view, the meaning of condition H is clear and unambiguous. After announcing that the insurer shall be under no obligation to assume charge of the settlement or defense of any suit brought against the insured, condition H provides that the insurer "shall have the right . . . to associate with the Insured . . . in the defense and control of any claim, suit or proceeding . . . where . . . it appears reasonably likely to involve the [insurer], in which event the Insured and the [insurer] shall co-operate in all things in the defense of such claim, suit or proceeding." In other words, although the insurer has no duty to defend a third party action, it yet has the right to associate in the defense and control of such litigation. Moreover, once that happens, the insured is required to cooperate.

Webster's New World Dictionary defines the intransitive verb "associate" as meaning to unite with, to join together. The same dictionary defines the intransitive verb "cooperate" as meaning to act or work together with another for a common purpose. Under the language of condition H, once the insured and the insurer have associated, they shall work together for a common purpose in defense of the third party action. The plain implication of such language is that the decision to take any step with regard to the third party action must be a joint decision.

Three options are at once suggested. Both the insured and the insurer could have readily agreed to go to trial, both could have agreed to settle or, as here, the parties could have failed to reach agreement on what step to take in the control of the litigation. Actually, the insured was willing to go to trial and the insurer wished to settle. In any event, with counsel for both the insured and the insurer associated as attorneys of record, no decision to act could be taken with regard to control and direction of the litigation unless it were a *joint decision*. The result was that each party to the insurance contract had what amounted to a veto power over what was to be done.

The record does not disclose the precise details of how the paper settlement of the Belyeu, third party action was accomplished, but, because of the "association" and "cooperation" provision of condition H, it would have been a procedural impossibility for the settlement to have been accomplished without the insured's concurrence. Thus, by "permitting" a settlement in excess of $100,000, defendant in substance *agreed* to it, and once having

done that, there is no way it could logically or legally contend that its self-insured retention was not committed.

This interpretation is reinforced by the language of the insuring agreements of the policy. Under an endorsement dated April 6, 1985, it was agreed that, "The first three lines of sub-paragraph (b) under insuring agreement 2 are amended to read as follows: (B) $100,000 ultimate net loss in respect of each occurrence not covered by underlying insurances." The unamended language preceding the foregoing specified that the insurer would be liable only for the ultimate net loss *in excess* of the limits of the underlying insurance (of which there was none) or (B) as recited above.

A very practical reason militates in favor of the foregoing interpretation of condition H, along with the insuring agreements which established the self-insured retention of $100,000. As pointed out by plaintiff's counsel at oral argument, were we to countenance the interpretation urged by defendant, i.e., that it could *permit* but not *agree* to the settlement, it would accord the insured the power *unilaterally* and arbitrarily to negate the self-insured retention feature of the policy in those instances where the insurer wished to settle because the projected damages exposure penetrated the floor of the excess coverage. If the insured were to be accorded such power, it could yield a result at substantial variance with actuarial reality and the premium paid for the policy.

In *Span, Inc.* v. *Associated Internat. Ins. Co.* (1991) 227 Cal.App.3d 463 [277 Cal.Rptr. 828], one of the issues in a declaratory relief action was whether the excess carrier had to "drop down" to pick up the primary coverage when the primary carrier became insolvent. The result there as here turned on interpretation of language on the excess coverage policy. Of interest to us in this case is an observation by the *Span* court, quoting a federal circuit court, "In general, an excess insurance policy provides coverage that begins only after a predetermined amount of primary coverage is exhausted. This underlying coverage reduces the risk that an excess insurer will have to pay for losses incurred by the insured. This reduced risk to the insurer translates into a reduced premium to the insured." (*Id.* at p. 474.) So it is here.

In sum, we hold that the terms and conditions recited in condition H, together with the insuring agreements, do not contemplate the spin which defendant has attempted to place on them here. In other words, the language of association and cooperation does not admit the possibility of an equivocal decision, such as here, where the insured purported to permit but not agree to a settlement in resolving the third party litigation.

Based upon the foregoing analysis, we hold that defendant is legally required to contribute its net self-insured retention toward settlement of the Belyeu action.

## DISPOSITION

The judgment is affirmed.

Ramierz, P. J., and Timlin, J., concurred.

Appellants' petition for review by the Supreme Court was denied September 19, 1991.