## CIRCUIT COURT OF HENRICO COUNTY

XL Insurance America, Inc.

v.

BJ's Wholesale Club, Inc.

May 31, 2013

Case No. (Civil) CL09-2852

BY JUDGE GARY A. HICKS

This matter came before this Court on October 25, 2012, for a one-day bench trial. The Court, having reviewed the record in this matter, the applicable case law and statutes, the *ore tenus* arguments of the parties, and the parties' post-trial submissions, hereby renders its findings of facts and conclusions of law in the following opinion.

### Issues

This is a declaratory judgment action presenting the single issue of whether BJ's Wholesale Club, Inc. (hereinafter "BJ's") must reimburse XL Insurance America, Inc. (hereinafter "XL") in the amount of $500,000.

### The Parties

XL is an excess insurer licensed to do business in the Commonwealth of Virginia. BJ's is a national chain of membership-only warehouse stores. BJ's purchased an excess insurance policy from XL whereby XL provided the top level of coverage above a $1,000,000 Discover Property & Casualty Insurance Company (hereinafter "Discover Re") policy, itself inclusive of BJ's' $500,000 Self-Insured Retention (hereinafter "SIR"). Pursuant to the policy issued by XL, BJ's agreed to pay its premiums and comply with the terms of the policy in exchange for insurance coverage for occurrences that exhaust the combined $1,000,000 limit of BJ's SIR and the Discover Re policy.

## The Underlying Lawsuit

The facts of the underlying lawsuit are not in dispute. In 2006, Karen Phillips was employed by BJ's in Norfolk, Virginia. One evening after work, Ms. Phillips' husband arrived at that particular store armed with a shotgun and proceeded to shoot and kill Ms. Phillips' sister in the parking lot. He then entered the store, where he shot Ms. Phillips in the head, causing her to sustain grievous injuries. As a result, Ms. Phillips filed suit against BJ's in the Circuit Court for the City of Norfolk on March 3, 2008, seeking damages in the amount of $65 million.

BJ's hired Erik Nyce as lead counsel for the matter. Robert Kelly was retained by XL to assist Mr. Nyce in defending the suit. The parties conducted extensive investigation and discovery in anticipation of trial. During this process, XL and BJ's began to disagree regarding how best to proceed. While XL favored a negotiated settlement, BJ's favored proceeding to trial.

Mr. Nyce and Mr. Kelly concluded that BJ's should settle the matter for $3,000,000-$5,000,000. Both attorneys agreed that a jury verdict as high as $12,000,000 was possible given the facts of the case. Melanie Tilden, claims manager for BJ's, rejected these assessments. During August of 2009, she informed all relevant parties that BJ's denied all liability in the matter and would not attend any mediation.

## The Mediation

Mediation of the underlying lawsuit took place on September 9, 2009. Messrs. Nyce and Kelly attended as counsel for BJ's. Mr. Michael Cortese appeared in his capacity as Assistant Vice President in excess claims for XL. Ms. Phillips appeared, represented by Brother Rutter and an associate with the law firm of Rutter Mills. Ms. Phillips' Attorney in Fact, Robert Slomick, also attended. Following a lengthy mediation assisted by Judge Thomas Shadrick, a Settlement Agreement (hereinafter "the Agreement") was reached. The Agreement provided for settlement of Ms. Phillips' claims against BJ's for $3,000,000. Mr. Nyce signed the Agreement, as did Ms. Phillips' Attorney in Fact, Robert Slomick. XL did not sign the Agreement.

## Analysis

The insurance policy at issue in this case provides that XL "will pay those sums that the 'Insured' becomes legally obligated to pay as damages arising out of an 'occurrence' which are in excess of the underlying insurance stated in Schedule A of this policy." XL's duty to pay a covered occurrence is triggered by payment of the "retained limit" either by BJ's or on behalf of BJ's. The policy defines "retained limit" as "[t]he total of the applicable limits of the underlying policies listed in Schedule A of this policy; plus the applicable limits of any other collectible insurance." Consequently, the

retained limit in this case is $1,000,000, the payment of which triggered XL's obligation to pay for an occurrence.

It is undisputed that XL paid the plaintiff in the underlying lawsuit $3,000,000 pursuant to the settlement agreement. As BJ's, through its counsel Erik Nyce, executed the settlement agreement in question, XL's subsequent payment of the $3,000,000 to the plaintiff in the underlying lawsuit constitutes a payment "on behalf" of BJ's sufficient to trigger BJ's' obligation to tender the $500,000 SIR to XL.

XL urges the Court to consider in its decision *Harbor Ins. Co. v. City of Ontario*, a 1991 California Court of Appeals case deciding similar facts and issues. *See* 231 Cal. App. 3d 927, 282 Cal. Rptr. 701 (1991). This Court is aware of the limited precedential value provided by this case; however, the policy and analysis underlying the decision are sound and apply to the matter before the Court.

In *Harbor Ins.*, the California Court of Appeals was faced with facts strikingly similar to those before the Court. There, the Harbor Insurance Company issued the City of Ontario (hereinafter "the City") an umbrella liability policy with a limit of $1,000,000 per occurrence. *Id.* at 930. The policy provided for a $100,000 self-insured retention. Prior to trial, defense counsel for the City informed their client that it faced substantial exposure to an adverse verdict as high as $2,000,000. Harbor Insurance recommended that the City settle the matter for $400,000. The City consequently granted Harbor Insurance permission to settle the matter for $400,000, but qualified that permission by stating that the City would not tender what remained of its self-insured retention. Notwithstanding the City's refusal to do so, Harbor Insurance entered into an agreement with the plaintiff to settle the matter for $360,000. *Id.* at 931. Harbor Insurance funded the settlement. *Harbor Ins.* at 930. The City refused to tender the remaining portion of its self-insured retention. *Id.*

Harbor Insurance subsequently brought a declaratory judgment action seeking a determination of whether the City was required to tender its self-insured retention. The trial court ruled that Harbor Insurance was entitled to recover the self-insured retention. *Id.* at 932. The City appealed.

On appeal, the California Court of Appeals rejected the City's argument that it gave its permission to Harbor Insurance to settle the matter, but not its agreement so as to commit itself to the self-insured retention pursuant to the policy. *See id.* at 935. The Court, focusing on that policy's cooperation clause, reasoned that, once the City permitted the settlement to take place, "defendant in substance *agreed* to it, and once having done that, there is no way it could logically or legally contend that its self-insured retention was not committed." *Id.* at 934. The Court then set forth the policy underpinnings of its holding as follows:

> were we to countenance the interpretation urged by defendant,
> i.e., that it could *permit* but not *agree* to the settlement, it

would accord the insured the power *unilaterally* and arbitrarily to negate the self-insured retention feature of the policy in those instances where the insurer wished to settle because the projected damages exposure penetrated the floor of the excess coverage. If the insured were to be accorded such power, it could yield a result at substantial variance with actuarial reality and the premium paid for the policy.

*Harbor Ins.* at 935 (emphasis in original).

The Court is persuaded by the above reasoning. Although the cooperation clause in the policy before the Court is dissimilar to the cooperation clause on which the California Court of Appeals partly based their decision in *Harbor Ins.*, nothing in that Court's reasoning suggests that the precise language compelled the decision reached. Rather, they held that the City was obligated to tender its self-insured retention because they possessed a duty to cooperate with Harbor Insurance in settling the matter. *See id.* at 934. Consequently, any settlement effectuated pursuant to the policy must necessarily have been a joint decision, with either party possessing *de facto* veto power. The same holds true in the present matter.

The policy between the parties requires BJ's to "[c]ooperate with [XL] in the investigation, *settlement*, or defense of any claim or 'suit'." Consequently, once BJ's, through counsel, permitted the meditation and subsequent settlement agreement, they "in substance agreed to it." *Id.* at 934. "[H]aving done that, there is no way it [can] logically or legally contend that its self-insured retention [is] not committed." *Id.* at 934-35.

### Apparent Authority

BJ's argued at trial that Erik Nyce lacked either actual or apparent authority to bind BJ's as to the $500,000 SIR. This position is supported by the deposition testimony of Erik Nyce. Mr. Nyce testified that he "made it clear to Judge Shadrick, [Mr.] Cortese, [and] everybody else, that [h]e did not have the authority to [ . . . ] fund either BJ's SIR or Discover Re's policy on top of BJ's SIR." None of the other parties present at mediation, including Robert Kelly, testified similarly.

In opposition, XL's position is that Mr. Nyce attended the mediation in his capacity as counsel for BJ's and executed the settlement agreement in that capacity, thereby making BJ's a signatory. XL's Assistant Vice President for Excess Claims, Mr. Cortese, testified that he had no knowledge, at the time of the mediation, that BJ's was refusing to tender the SIR.

Virginia law is clear that an attorney lacks authority to enter into a settlement on behalf of a client without "express authority." *Dawson v. Hotchkiss*, 160 Va. 577, 581-82, 169 S.E. 564 (1933). However, a client

may be bound where his or her attorney acted with apparent authority. *See Singer Sewing Machine Co. v. Ferrell*, 144 Va. 395, 132 S.E. 312 (1926).

A client may bestow his or her attorney with the apparent authority to enter into a contract or settle a claim. *See Singer*, 144 Va. at 402-05. Apparent authority is created when the principal makes manifestations which cause the third party to reasonably believe that the agent is authorized to do a particular act. Restatement (Third) of Agency § 2.03 (2006). Without manifestations by the principal, there can be no apparent authority. *Andrews v. Andrews*, 80 Va. Cir. 279 (2010). However, a third party is entitled to believe an agent has the authority he purports to exercise so long as the belief is reasonably justified by the circumstances. *See Singer*, 144 Va. at 402-05. A third party is under no obligation to verify the actual authority of an agent. Once a third party has ascertained the apparent authority of an attorney, the apparent authority is the real authority.

It is important in determining the scope of an attorney's apparent authority to pay particular attention to the actions of the client, as an attorney may not define his authority independent of his client's wishes. *Andrews*, 80 Va. Cir. at 282. This is especially true in the context of settlement agreements, where the decision to settle unquestionably belongs to the client. Under Virginia law, an attorney is not bestowed with the apparent authority to settle his client's claims merely because he or she was retained and authorized to negotiate in the context of settlement discussions.

In *Walson v. Walson*, 37 Va. App. 208 (2001), a client authorized her attorney to attend settlement negotiations on her behalf. During these negotiations, the attorney made numerous telephone calls to his client and kept her informed with respect to the various issues being discussed and positions being taken. At one point, the attorney informed the parties that he lacked his client's agreement with respect to a particular issue. He left the negotiation and phoned his client, at which time the issue was not resolved. Notwithstanding this, the attorney received an email from his client the following day that, in his opinion, gave him authority to settle the matter. He drafted a settlement agreement and had it entered. His client challenged the settlement agreements on grounds that she never authorized him to settle. The Court of Appeals agreed. They held that the record was devoid of any verbal or nonverbal representations by the client that she had authorized her attorney to sign a settlement agreement on her behalf. That she authorized him to attend settlement negations and relay offers and counteroffers was insufficient to confer apparent authority to settle.

In *Singer*, a purported settlement agreement was reached between counsel for plaintiff and defendant. When the agreement was reached, counsel for Plaintiff told counsel for Defendant that he would talk to his client, the implication being that he would obtain his client's consent to settle. At that time, counsel for Plaintiff conferred with his client's husband in the presence of, but not within earshot of, counsel for Defendant.

Counsel for Plaintiff then returned to accept the settlement agreement. The Supreme Court of Virginia held that "[n]othing whatsoever took place to put defendant's counsel upon notice that plaintiff was not aware of the scope of the settlement. . . ." The act of conferring with his client's husband in the presence of defense counsel was sufficient to confer apparent authority notwithstanding his lack of actual authority to settle.

Viewing the record in light of the relevant case law, it is the Court's ruling that Mr. Nyce possessed apparent authority to bind BJ's as to both the settlement agreement and the SIR. Nothing at the mediation took place to put XL on notice that Mr. Nyce lacked authority to settle the matter or bind BJ's as to the SIR. BJ's sent two attorneys, Messrs. Nyce and Kelly, to attend mediation in their representative capacities. Both attorneys participated actively in the mediation. As in *Singer*, Mr. Nyce left the negotiating table to confer with his client via telephone. Both attorneys for BJ's advised Mr. Cortese that $3,000,000 was a good settlement amount. Upon conclusion of the mediation, Mr. Nyce drafted and signed the documents memorializing the settlement agreement, then prepared the final documents ultimately removing this case from the Norfolk Circuit Court's docket.

Mr. Nyce testified at deposition that he "made it clear to Judge Shadrick, Cortese, everybody else, that [he] was [attending the mediation], but [he] did not have the authority to [ . . . ] agree to fund [the] BJ's SIR. . . ." Mr. Nyce's testimony to this effect was not corroborated. Importantly, co-counsel for BJ's, Mr. Kelly, did not testify to hearing such a disclaimer. Rather, the record indicates that counsel for BJ's acted in such a way as to create the reasonable belief that they possessed authority to bind BJ's as to the settlement agreement and $500,000 SIR.

The facts here are closer to *Singer* than they are to *Walson*. In *Walson*, the attorney in question ended negotiations with an explicit disclaimer of authority with respect to a particular issue. Notwithstanding this disclaimer, he appeared the following day and executed a settlement agreement against his client's wishes. Moreover, the attorney in that case repeatedly sent to his client for endorsement draft settlement agreements, indicating that his client's signature, rather than his own, would be required to bind the parties to settlement. Neither of these facts are presented by the record.

Rather, this situation is more akin to that in *Singer*, where the Supreme Court of Virginia found apparent authority where the attorney "consulted with his client relative to the compromise in the presence of the defendant and returned with assent." 144 Va. at 404. Though the consultation here occurred via telephone, neither case stands for the proposition that the method of communication between attorney and client is operative, but rather they indicate that the timing and circumstances of the communication control. As discussed in *Walson*, the consultation in *Singer* took place contemporaneously to the negotiations rather than after the negotiations broke down, as was the case in *Walson*.

Here, Mr. Nyce consulted with his client during the mediation on several occasions, returning each time to continue the process. At no point did he indicate that BJ's was unwilling to settle, nor did negotiations break down following one of these consultations. Rather, each time he returned to the table, negotiations continued, ultimately resulting in an agreement signed by Mr. Nyce. All of his actions created the reasonable belief that he possessed the authority to bind BJ's to the agreement and SIR.

### *Attorney's Fees*

The Court denies each party's request for attorney's fees.

BJ's is to pay XL the $500,000.00 SIR amount within thirty days of the entry of the Final Order.