[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-14070
_____

D.C. Docket No. 1:12-cv-04061-SCJ

GARY WAYNE COKER,
TERESINA COKER,

Plaintiffs-Appellees,

versus

AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY,
ENDURANCE AMERICAN SPECIALTY INSURANCE COMPANY,
GREAT AMERICAN INSURANCE COMPANY,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Georgia
_____

(June 15, 2016)

Before HULL and BLACK, Circuit Judges, and ROTHSTEIN,[*] District Judge.

HULL, Circuit Judge:

In this uninsured/underinsured motorist ("UM") coverage case, three excess liability insurers—Great American Insurance Company ("Great American"), American Guarantee & Liability Insurance Company ("American Guarantee"), and Endurance American Specialty Insurance Company ("Endurance") (collectively "the Defendants")—appeal the district court's order granting summary judgment in favor of Gary and Teresina Coker ("the Cokers") with respect to the Cokers' breach of contract claims against the Defendants. The district court concluded that Georgia's UM statute imposed upon the Defendants an unconditional obligation to provide UM coverage to Gary Coker as if they were primary insurers, and that the Defendants' failure to tender payment amounted to a breach of contract. After review of the record and with the benefit of oral argument, we reverse the district court's summary judgment ruling.

## I.     FACTUAL BACKGROUND

### A.     Car Accident, Consent Judgment, and Relevant Liability Policies

On September 18, 2007, Plaintiff Gary Coker was driving a truck owned by his then employer, Ansco & Associates ("Ansco"), on a Georgia road. Third-party

---

[*]Honorable Barbara Jacobs Rothstein, United States District Judge for the Western District of Washington, sitting by designation.

motorist Donald Woodall crossed the center line of the road and struck Coker head on.  Coker was severely injured in the accident.

In September 2009, the Cokers sued Woodall in the Superior Court of Walton County, Georgia.  In November 2010, the Cokers obtained a $5.5 million consent judgment against Woodall.  Though Woodall had an automobile liability insurance policy, he was considered "underinsured" because his policy limits were $25,000 and were not nearly high enough to satisfy the consent judgment.  An uninsured motorist is not only a person who has no insurance at all, but also a person, such as Woodall, who was underinsured.

The Cokers provided Woodall with a limited liability release in exchange for $25,000, the full limit of Woodall's automobile liability policy.  Despite this partial recovery from Woodall's insurer, the vast majority of the $5.5 million consent judgment remained unsatisfied.  To satisfy the remainder of the consent judgment, the Cokers turned to policies purchased by Coker's employer, Ansco.

At the time of the accident, Ansco held the following liability insurance policies:

a. Liberty Mutual Insurance Company ("Liberty Mutual") Business Automobile Policy No. AS2-631-004260-027 ("the Liberty Mutual policy"), with limits of $5 million;

b. Westchester Fire Insurance Company ("Westchester") Umbrella Policy No. G22049860002 ("the Westchester policy"), with limits of $10 million;

3

c.    Great American Insurance Company Excess Liability Policy No. TUE356014902 ("the Great American policy"), with limits of $10 million;

d.    American Guarantee & Liability Insurance Company Excess Liability Policy No. AEC913878501 ("the American Guarantee policy"), with limits of $25 million; and

e.    Endurance American Specialty Insurance Company Surplus Lines Policy No. ELD10000214301 ("the Endurance policy"), with limits of $25 million.

These policies were vertically structured so that the Liberty Mutual policy provided first-layer primary coverage, the Westchester policy provided second-layer umbrella[1] coverage, the Great American policy provided third-layer excess coverage, the American Guarantee policy provided fourth-layer excess coverage, and the Endurance policy provided fifth-layer excess coverage.

As noted above, at the time of the accident, Coker was driving his employer Ansco's truck and acting in the course and scope of his employment with Ansco. The parties do not dispute that Coker was insured under the Ansco policies.

**B.    The Liberty Mutual Primary Policy**

The $5 million Liberty Mutual policy provides primary automobile liability coverage. The Liberty Mutual policy specifically provides that "[f]or any covered 'auto' you own, this Coverage Form provides primary insurance." The "Uninsured

---

[1]In the event that the Liberty Mutual policy did not provide coverage for a particular occurrence resulting in bodily injury, the Westchester policy would provide primary coverage for that occurrence in excess of a $10,000 deductible.

4

Motorist Coverage Option Form" attached to the Liberty Mutual policy reflects that Ansco explicitly rejected UM coverage in writing on both September 5, 2006, and September 24, 2007.

## C.    The Westchester Umbrella Policy

The $10 million Westchester policy provides coverage for "those sums in excess of the 'Retained Limit' which the 'Insured' by reason of liability imposed by law . . . shall become legally obligated to pay."  The Westchester policy defines "Retained Limit" as either "the total of the applicable limits of the 'Underlying Insurance,'" or, "with respect to any 'Occurrence' that is not covered by 'Underlying Insurance' or any other insurance," $10,000.  The Westchester policy defines "Underlying Insurance" as the policies listed in the Schedule of Underlying Insurance.  The Schedule of Underlying Insurance lists, among other policies, the Liberty Mutual policy.  The Schedule of Underlying Insurance notes that the Liberty Mutual policy does not contain UM coverage.

Under a section titled "Limits of Insurance," the Westchester policy provides, "If the applicable limits of insurance of the 'Underlying Insurance' . . . are reduced or exhausted by payments from one or more 'Occurrences' happening during the 'Policy Period' of this policy, the 'Limits of Insurance' of this policy will apply in excess of such reduced or exhausted limits."

5

The Westchester policy also contains an "Automobile Limitation" endorsement to coverage.  This endorsement provides:

> With respect to 'Bodily Injury' or 'Property Damage' arising out of the . . . use . . . of any 'Automobile,' this policy is limited to the coverage provided by the 'Underlying Insurance' as listed on . . . [the] Schedule of Underlying Insurance.
>
> If coverage is not provided by 'Underlying Insurance,' coverage is excluded from this policy.
>
> However, this policy does not apply to any obligation or liability imposed on the 'Insured' under any . . . uninsured motorists [or] underinsured motorists law or any similar law.

Attached to the Westchester policy is an "Uninsured Motorists Coverage Offer" form reflecting that Ansco explicitly rejected UM coverage in writing. However, Ansco executed this form on May 30, 2008—eight months after Coker's accident.

## D.    The Great American Excess Policy

The $10 million Great American policy provides coverage to Ansco "only in excess of the Underlying Limits of Insurance" provided by the Westchester policy. The Great American policy provides:

> [I]f the underlying Limits of Insurance stated in [the Westchester policy] are reduced or exhausted solely by payment of "loss," such insurance provided by this policy will apply in excess of the reduced Underlying Limits or, if all Underlying Limits are exhausted, will apply as underlying insurance subject to the same terms, conditions, definitions and exclusions of the [Westchester] Policy, except for the terms, conditions, definitions and exclusions of this policy.

The Great American policy further states that "[c]overage under this policy will not apply unless and until the Insured or the Insured's underlying insurance has paid or is obligated to pay the full amount of the Underlying Limits of Insurance stated in [the Westchester policy]."

### E.    The American Guarantee Excess Policy

The $25 million American Guarantee policy provides coverage for "the sums in excess of the total Underlying Limits of Insurance shown in . . . the Declarations that the insured becomes legally obligated to pay as damages."  The American Guarantee policy declarations reference the $10 million Westchester policy and state that the "Total Limits Of All Underlying Insurance" is $20 million.[2]

Under the section titled "Limits of Insurance," the American Guarantee policy states that its coverage "applies only in excess of the Underlying Limits of Insurance shown in . . . the Declarations."  The American Guarantee policy further states that "[c]overage under this policy will not apply unless and until the insured or the insured's underlying insurance has paid or is obligated to pay the full amount of the Underlying Limits of Insurance stated in . . . the Declarations."

---

[2]Though the American Guarantee policy does not mention the $10 million Great American policy, together the $10 million Westchester policy and the $10 million Great American policy account for the $20 million excess coverage threshold.

**F.    The Endurance Excess Policy**

The $25 million Endurance policy provides coverage for losses "in excess of the 'underlying limits of insurance,'" defined as "the sum of the limits of all applicable 'underlying insurance' listed in Item 5. of the Declarations."  Item 5 of the Declarations refers to an attached "Schedule of Underlying Policies," which identifies the "first underlying insurance policy" as the Westchester policy and the "other underlying insurance policies" as the Great American and American Guarantee policies.

Under the section titled "Limits of Insurance," the Endurance policy states that its coverage "applies only in excess of the 'underlying limits of insurance' and only after the 'underlying limits of insurance' have been exhausted."  The Endurance policy further states that "[c]overage under this policy will not apply unless and until the insured or the insured's 'underlying insurance' is obligated to pay the full amount of the 'underlying limits of insurance.'"

**G.    Demands for Payment**

In March 2011, the Cokers made separate written demands against Liberty Mutual, Westchester, and each of the Defendants for payment of the $5.5 million consent judgment.  In March 2012, the Cokers entered into a confidential settlement agreement with Liberty Mutual for substantially less than the $5 million policy limit.  In June 2012, the Cokers entered into a confidential settlement

8

agreement with Westchester for substantially less than the $10 million policy limit. Despite the money recovered in the Cokers' settlements with Liberty Mutual and Westchester, a substantial portion of the $5.5 million consent judgment remained unsatisfied.

The three excess insurer Defendants here did not tender payment in response to the Cokers' demands.

## II.    PROCEDURAL HISTORY

In October 2012, the Cokers filed a complaint against Defendants Great American, American Guarantee, and Endurance in the State Court of Fulton County, Georgia, alleging causes of action for breach of contract and bad faith relating to the Defendants' refusal to tender payment for the $5.5 million consent judgment.  The Defendants removed the action to federal district court.

In an August 27, 2014 order, the district court granted partial summary judgment in favor of the Cokers as to their breach of contract claims and denied the Defendants' summary judgment motions.  The district court concluded that the Defendants' excess liability policies provided "automobile liability insurance" and, therefore, were required to provide UM coverage by operation of Georgia's UM statute.  The district court further concluded that enforcing the vertical exhaustion requirements in the Defendants' excess policies "would place a limit on the amount [the Cokers] are able to recover under the statute and not be in accordance

9

with the remedial purpose of the [UM] statute."  The Defendants now appeal the

district court's summary judgment order. [3]

## III.   DISCUSSION

On appeal, the Defendants argue that the district court erred by granting

summary judgement in favor of the Cokers on the ground that Georgia's UM

statute imposed upon the Defendants an unconditional obligation to provide UM

coverage to the Cokers as if the Defendants were primary insurers. [4]  The

Defendants principally argue that, regardless of any obligations imposed by

Georgia's UM statute, the terms of the Defendants' policies required the Cokers to

exhaust the limits of the Westchester policy and, if applicable, any other

underlying excess insurance policies before seeking payment from the Defendants.

We first consider whether Georgia's UM statute applies to, and imposes a

coverage obligation upon, the Defendants' excess liability policies and conclude

that it does.  Next, we interpret the terms of the Defendants' excess liability

policies and conclude that they all contain vertical exhaustion requirements.

Finally, we consider whether the statutory coverage obligation imposed by

---

[3]Following a subsequent bench trial, the district court issued an order in favor of the Defendants as to the Cokers' bad faith claims.  That order is not being appealed.

[4] We review de novo the district court's grant of summary judgment. Owen v. I.C. Sys., Inc., 629 F.3d 1263, 1270 (11th Cir. 2011).  Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Georgia's UM statute supersedes the vertical exhaustion requirements contained in the Defendants' excess liability policies and conclude that it does not.

## A.    Georgia's UM Statute Applies to Defendants' Excess Liability Policies

Georgia's UM statute is found at Ga. Code Ann. § 33-7-11.  The version of section 33-7-11 in effect at the time of Coker's September 2007 accident provided, in relevant part:

> (a)(1) No automobile liability policy or motor vehicle liability policy shall be issued or delivered in this state to the owner of such vehicle or shall be issued or delivered by any insurer licensed in this state upon any motor vehicle then principally garaged or principally used in this state unless it contains an endorsement or provisions undertaking to pay the insured damages for bodily injury, loss of consortium or death of an insured or for injury to or destruction of property of an insured under the named insured's policy sustained from the owner or operator of an uninsured motor vehicle, within limits exclusive of interests and costs which at the option of the insured shall be:
>
> > (A)    Not less than $25,000.00 because of bodily injury to or death of one person in any one accident . . . ; or
> >
> > (B)    Equal to the limits of liability because of bodily injury . . . or death . . . if those limits of liability exceed the limits of liability set forth in subparagraph (A) of this paragraph.

2006 Ga. Laws 815, 816 (current version at Ga. Code Ann. § 33-7-11 (2014)).  The statute further provided that UM coverage "shall not be applicable where any insured named in the policy shall reject the coverage in writing." Id. at 817; see also Abrohams v. Atl. Mut. Ins. Agency, 638 S.E.2d 330, 333 (Ga. Ct. App. 2006) ("[Section 33-7-11] specifically requires that, without a written waiver, all

automobile policies provide UM coverage equal to the policies' overall liability limits.").

Typically, when interpreting a contract under Georgia law, courts must "construe [a] contract as written and not . . . make a new contract for the parties." Friday v. Friday, 755 S.E.2d 707, 712-13 (Ga. 2014) (quotation marks omitted). However, an insurance policy that is not in compliance with the Georgia Insurance Code "shall be construed and applied in accordance with such conditions and provisions as would have applied had the policy . . . been in full compliance with [the Code]." Ga. Code Ann. § 33-24-12(a). In doing so, "the contract will not be rendered void[,] but the provisions of the statute will be grafted into the policy." Flewellen v. Atlanta Cas. Co., 300 S.E.2d 673, 678 (Ga. 1983).

Thus, under the 2006 version of section 33-7-11, an insurer that failed to obtain a written rejection of UM coverage from the insured was required to provide UM coverage "[e]qual to the limits of liability because of bodily injury." 2006 Ga. Laws at 816. The mandatory provision of UM coverage would be "grafted" into the non-compliant policy, and non-compliant provisions would be rendered void by operation of statute. Flewellen, 300 S.E.2d at 678. For example, if an automobile insurance policy with a $1 million policy limit contained a provision explicitly excluding the provision of UM coverage, but the insurer failed to obtain a written rejection of UM coverage from the insured, then the provision excluding

UM coverage would be rendered void and the insurer would be required to provide UM coverage up to the $1 million policy limit.  See Zurich Am. Ins. Co. v. Beasley, 666 S.E.2d 83, 83-85 (Ga. Ct. App. 2008); see also Abrohams, 638 S.E.2d at 331-33.

The requirements found in the 2006 version of section 33-7-11 applied not only to primary automobile insurance policies, but to related umbrella and excess liability policies as well. [5]  See id. at 333.  Thus, at the time of Coker's accident, any umbrella or excess liability policy providing coverage for bodily injury sustained by the insured due to a motor vehicle accident was required by law to provide UM coverage to the insured unless the insured rejected UM coverage in writing.  See id.

Here, the Abrohams decision makes clear that the Defendants' excess liability policies, which undoubtedly provide "automobile or motor vehicle liability insurance" in excess of the Westchester policy, are subject to the requirements of section 33-7-11.  See id.  Because Ansco did not reject UM coverage in writing with respect to any of the Defendants' excess liability policies, the Defendants had a statutory obligation to provide UM coverage up to the injury limits of their

---

[5]The Georgia General Assembly amended section 33-7-11 in 2008 to exclude umbrella or excess liability policies from its UM coverage requirements. See 2008 Ga. Laws 1192, 1194. The 2008 amendment expressly applies to policies issued, delivered or renewed in Georgia on and after January 1, 2009. See id. at 1198. Accordingly, the amendment does not apply to the policies at issue in this appeal.

respective policies.   See id.; 2006 Ga. Laws at 817.  Indeed, all of the Defendants admit that (1) they did not obtain written rejections of UM coverage [6] and (2) their excess policies provide "automobile or motor vehicle liability insurance" subject to the requirements of section 33-7-11.  Accordingly, by operation of statute, each Defendant's excess liability policy provided UM coverage up to the liability limits of that policy.

Although they acknowledge their statutory obligation to provide UM coverage, the Defendants argue that, pursuant to the terms of their excess liability policies, they were not required to tender payment until the Cokers exhausted the policy limits of the underlying $10 million Westchester policy and, if applicable, any other underlying excess liability policies.[7]  Accordingly, we examine the exhaustion requirements found in excess liability policies governed by Georgia law as well as those contained in the Defendants' policies.

---

[6]Endurance and American Guarantee argue that Ansco's written rejection of UM coverage in the Liberty Mutual policy functions as a written rejection of UM coverage for all excess policies because those policies contain "follow form" provisions.  We need not address this argument in order to resolve this appeal and assume arguendo that the "follow form" provisions in the Defendants' excess policies did not affect the Defendants' statutory obligations to provide UM coverage.

[7]In Abrohams, the injured party had severe injuries from the accident and a $1.45 million claim.  Abrohams, 638 S.E.2d at 331.   It was not disputed that the injured party had or would receive the full benefit of two underlying policies, which were the tortfeasor's $25,000 per person and $50,000 per accident policy, and the injured party's own $500,000 automobile liability policy.  Id. at 331 & n.3.  As such, there was no vertical exhaustion issue in Abrohams.

**B.    Defendants' Excess Liability Policies Contain Vertical Exhaustion Requirements**

"Excess or secondary coverage is coverage whereby, under the terms of the policy, liability attaches only after a predetermined amount of primary coverage has been exhausted." U.S. Fire Ins. Co. v. Capital Ford Truck Sales, Inc., 355 S.E.2d 428, 431 (Ga. 1987).  Thus, excess policies, by their very nature, contain an exhaustion requirement.  Georgia courts have repeatedly recognized the validity of excess policies and the exhaustion requirements necessarily embedded within those policies.  See, e.g. Jackson v. Sluder, 569 S.E.2d 893, 898 (Ga. Ct. App. 2002) ("[E]xcess insurance coverage is not regarded as collectible insurance until the limit of liability of the primary policy is exhausted." (quotation marks omitted)); Atl. Wood Indus. v. Lumbermen's Underwriting All., 396 S.E.2d 541, 545 (Ga. Ct. App. 1990) (concluding that the exhaustion of the limits of a primary liability policy was "a condition precedent" to recovery under an excess policy).

This Court has determined that, under Georgia law, when an excess policy clearly sets a threshold starting point for payment, the contract is unambiguous and must be enforced.  See Garmany v. Mission Ins. Co., 785 F.2d 941, 945-46 (11th Cir. 1986).

Here, each of the Defendants' excess liability policies contain unambiguous language limiting recovery to only those amounts exceeding the policy limits of an underlying insurance policy or policies.  The Great American policy contains

15

language providing that no coverage is available until the Westchester policy limits are exhausted. The American Guarantee policy contains language providing that no coverage is available until the Westchester and Great American policy limits are exhausted. The Endurance policy contains language providing that no coverage is available until the Westchester, Great American, and American Guarantee policy limits are exhausted. Based on these terms, the Defendants were under no obligation to provide any coverage, UM or otherwise, until the Cokers exhausted the policy limits of the Westchester policy, which they did not do.

The Cokers nevertheless contend that the exhaustion requirements in the Defendants' excess liability policies are void under section 33-7-11, at least to the extent that those exhaustion requirements would limit in any way the provision of UM coverage. Thus, we consider whether section 33-7-11 supersedes the vertical exhaustion requirements contained in the Defendants' excess liability policies.

## C.    Section 33-7-11 Does Not Supersede the Vertical Exhaustion Requirements in Defendants' Excess Liability Policies

The Georgia Supreme Court has described the remedial purpose of section 33-7-11 as follows:

> The purpose of uninsured motorist or UM coverage is to place the injured insured in the same position as if the offending uninsured motorist were covered with liability insurance. Stated otherwise, the purpose of uninsured motorist legislation is to require some provision for first-party insurance coverage to facilitate indemnification for injuries to a person who is legally entitled to recover damages from an uninsured motorist, and thereby to protect innocent victims from the

16

> negligence of irresponsible drivers. The Georgia uninsured motorist statute is designed to protect the insured as to his actual loss, <u>within the limits of the policy or policies</u> of which he is a beneficiary.

State Farm Mut. Auto. Ins. Co. v. Adams, 702 S.E.2d 898, 900 (Ga. 2010) (emphasis added) (quotation marks and citations omitted).

According to the Georgia Court of Appeals, section 33-7-11 "states in plain language that <u>every</u> policy issued or delivered in [Georgia] shall undertake to pay the insured all sums which he is legally entitled to recover from the owner or operator of an uninsured motor vehicle." Abrohams, 638 S.E.2d at 333 (quotation marks omitted). The court further stated that "[t]here are no exceptions or qualifications to this statutory requirement." Id. (quotation marks omitted). This is because section 33-7-11 is "remedial in nature and must be broadly construed to accomplish [its] legislative purpose." Id. at 332 (quotation marks omitted).

Georgia courts have never explicitly addressed whether section 33-7-11 renders void the vertical exhaustion requirement inherent in every excess liability policy. Still, Georgia courts have acknowledged the statute's remedial intent and have concluded that section 33-7-11 places strict requirements on insurers. For example, Georgia courts have held that section 33-7-11 may void routine "other insurance" provisions that seek to limit liability when multiple policies that are horizontally aligned provide UM coverage. See, e.g., State Farm Mut. Auto. Ins.

Co. v. Murphy, 177 S.E.2d 257, 260 (Ga. 1970); Travelers Indem. Co. v. Williams, 167 S.E.2d 174, 175-76 (Ga. Ct. App. 1969).

The problem for the Cokers is that nothing in section 33-7-11 voids the vertical exhaustion requirements of umbrella and excess liability policies governed by Georgia law.  First, interpreting section 33-7-11 that way would, in effect, preclude the existence of a market for excess UM coverage in Georgia.  Under the Cokers' interpretation of section 33-7-11, parties could never contract for excess UM coverage because the vertical exhaustion requirements inherent in every excess policy would always violate section 33-7-11 and convert all excess policies into primary policies.  However, parties do contract for excess UM coverage, and Georgia courts have implicitly recognized the validity of those agreements.  See, e.g., Progressive Classic Ins. Co. v. Nationwide Mut. Fire Ins. Co., 670 S.E.2d 497, 499 (Ga. Ct. App. 2008) (discussing the priority of three excess policies that provided potential UM coverage "if the limits of the [primary] policies are exhausted").

Second, while section 33-7-11 imposes a duty to provide UM coverage and may invalidate certain "other insurance" provisions, nothing in section 33-7-11 or the relevant case law explicitly proscribes the use of coverage limitations that depend on the exhaustion of underlying policy limits in a tiered insurance scheme. The cases that the Cokers cite to suggest otherwise are distinguishable because

18

they all involve priority disputes between multiple primary UM carriers. Such cases are of little help here, where the dispositive issue is not a priority dispute between primary UM carriers, but a threshold coverage defense asserted by excess UM carriers. Without an explicit proscription from the Georgia courts, we cannot conclude that section 33-7-11 would render void the vertical exhaustion requirement that, under Georgia law, is the <u>defining</u> characteristic of an excess liability policy. To do so would alter the nature and fundamental purpose of the agreement itself—that is, to provide <u>excess</u> coverage. See <u>U.S. Fire Ins. Co.</u>, 355 S.E.2d at 431.

Third, a vertical exhaustion requirement does not undermine the remedial purpose of section 33-7-11. Although there are no "exceptions or qualifications" to the statutory requirement that an insurer "undertake to pay the insured all sums which he is legally entitled to recover," we do not see how enforcing a vertical exhaustion provision, alone, would prevent an insured from recovering those sums to which he is "legally entitled." <u>Abrohams</u>, 638 S.E.2d at 333 (quotation marks and emphasis omitted). The only way an insured might not recover for the full amount of his injuries—and therefore realize the harm section 33-7-11 was designed to prevent—is if, as is the case here, he settles with an underlying insurer for less than the policy limits. But in that case, the insured voluntarily settled for less than the policy limits and, therefore, is undercompensated of his own volition.

19

In such a situation, it is not the exhaustion requirement that directly contravenes the legislative intent of section 33-7-11, but the insured's own settlement negotiations.

For these reasons, we conclude that section 33-7-11 does not vitiate the vertical exhaustion requirement of an umbrella or excess liability policy governed by Georgia law.  As such, we conclude that the Defendants are entitled to summary judgment in their favor with respect to the Cokers' breach of contract claims.  Each Defendant's excess policy contained an unambiguous statement that coverage would not apply until the insured exhausted the $10 million policy limit of the Westchester policy.  Indeed, the American Guarantee and Endurance policies even contained further vertical exhaustion requirements with respect to their codefendants.  Though the Defendants were obligated by statute to provide UM coverage, they did so in the permissible excess way.

Because the Cokers failed to exhaust the limits of the underlying Westchester policy, the Defendants were under no obligation to provide any coverage whatsoever.  As such, they are entitled to summary judgment on the Cokers' breach of contract claims.

## IV.    CONCLUSION

For the foregoing reasons, the district court's August 27, 2014 order granting the Cokers' motion for partial summary judgment against the Defendants and

20

denying the Defendants' motions for summary judgment against the Cokers is

**REVERSED**.  The case is **REMANDED** for entry of judgment in favor of the

Defendants.